JAMES STEBBINGS, Plaintiff-Appellant, v. THE UNIVERSITY OF CHICAGO, Defendant-Appellee.

First District (2nd Division)   No. 1—99—1835

Opinion filed March 14, 2000.

Christopher V. Langone and Joel D. Dabisch, both of Langone Law Firm, and Lance A. Raphael, of Consumer Advocacy Center, both of Chicago, for appellant.

Susan Getzendanner, Matthew R. Kipp, and Nancy S. Eisenhauer, all of Skadden, Arps, Slate, Meagher & Flom, of Chicago, for appellee.

PRESIDING JUSTICE COUSINS delivered the opinion of the court:

The plaintiff, Dr. James Stebbings, was employed as a medical researcher by the University of Chicago. He claims to have discovered that, in the course of an experiment, human test subjects were exposed without their permission to levels of radiation much higher than had been approved. Dr. Stebbings alleges that he was fired for insisting that the matter be reported to the National Institutes of Health, the federal government agency that had funded the experiment.

In 1992, Dr. Stebbings brought a retaliatory discharge action against the University of Chicago. After voluntarily dismissing the action once, he filed it again in 1996. The trial court eventually dismissed the fourth amended complaint with prejudice on the grounds that Stebbings had failed to state a valid claim for retaliatory discharge.

Stebbings now appeals arguing that the trial court erred in rejecting his claim that his firing violated: (1) a clearly mandated public policy of protecting the lives and property of the state's citizens from the hazards of radiation; and (2) a clearly mandated public policy of informed consent in medical research.

We reverse and remand.

BACKGROUND

The University of Chicago (the University) hired Dr. Stebbings on April 1, 1981, to work in the Argonne Center for Human Radiobiology at Argonne National Laboratory (Argonne). In 1984, the University applied to the National Institutes of Health (NIH) for a grant to conduct a study on the interaction between passive smoking and contact with radioactive materials. Stebbings was to be in charge of the project, which the NIH approved for two years.

As initially conceived and implemented, the project was a descriptive field study. But, Stebbings alleges, due to the University's failure to provide the support it had committed for the study, it could not be carried out as planned. The University, Stebbings claims, ordered him over his objections to apply for the second year of NIH funding. In order to rescue the study, the researchers had to make fundamental changes.

The application for funding for the second year of the study proposed that human subjects be exposed in several sittings to radon gas and its progeny in the laboratory. The NIH and Argonne's "Review Committee for Research Involving Human Subjects" approved the experiments at specified levels of radiation exposure. The levels of exposure were limited for safety reasons to the amount that was as low as reasonably achievable. Twelve volunteers were chosen for the study, and after complete disclosure concerning the experiment and the risks associated with it, they consented to be exposed to the radon.

According to Stebbings, Robert Schlenker, an Argonne acting section head, oversaw this experiment. Stebbings claims that, under Schlenker's supervision, the test subjects were exposed on at least one occasion to radiation at levels 10 to 15 times as intense as had been agreed upon. Shortly thereafter Schlenker left his research position to take an administrative job at Argonne. Stebbings discovered the overexposure in reviewing the data in preparation for the final progress report for the study.

He reported the situation to the head of Argonne's "Review Committee for Research Involving Human Subjects," Edwin Westbrook. A month later, when no action had been taken, Stebbings reported the matter to Eli Huberman, an Argonne division head. Huberman prepared a report that went to the United States Department of Energy (DOE). On July 20, 1990, after it received the report, the DOE issued a stop-work order for all human subjects research in the National Laboratory System while the DOE reviewed the laboratory assurance procedures for the protection of human subjects.

Stebbings, noting that a report had not been made to the NIH, wrote a memo expressing his belief that such a report was necessary.

Stebbings alleges that federal regulations for the protection of human research subjects (45 C.F.R. § 46.103 (1997)), as well as the University's written assurance that it would comply with those regulations, legally mandated a report to NIH.

On August 14, 1990, the University discharged Stebbings, effective September 30, 1990.

In January 1992, Stebbings filed an action against the University alleging wrongful termination. He claimed that his discharge violated the policy behind such statutes as section 5851 of the Energy Reorganization Act of 1974 (42 U.S.C. § 5851 (1994)); the Radon Mitigation Act (420 ILCS 50/1 *et seq.* (West 1996)); and the Radiation Protection Act of 1990 (420 ILCS 40/1 *et seq.* (West 1996)). The University moved to dismiss the complaint on the grounds that Stebbings' termination did not violate any clearly mandated public policy. Judge Willard Lassers denied the motion. In November 1995, Stebbings voluntarily dismissed his complaint pursuant to section 2—1009 of the Code of Civil Procedure. 735 ILCS 5/2—1009 (West 1996).

A year later, Stebbings, represented by new counsel, refiled the action before Judge David Lichtenstein. In April 1997, the University again moved to dismiss. In September 1997, Stebbings filed an amended complaint. The trial court dismissed the complaint without prejudice as legally insufficient.

Stebbings then filed a second amended complaint. The University moved to dismiss. Stebbings moved for leave to amend once again. Stebbings' motion was granted, and Stebbings filed a third amended complaint. The trial court dismissed the third amended complaint with leave to amend. On February 5, 1999, Stebbings filed the fourth amended complaint. On May 7, 1999, the trial court dismissed the complaint, this time with prejudice, under section 2—615 of the Code of Civil Procedure, for the reasons that the University gave in the memorandum accompanying its motion to dismiss. 735 ILCS 5/2—615 (West 1996).

ANALYSIS

Introduction

We review a section 2—615 dismissal under a *de novo* standard. *Sherman v. Kraft General Foods, Inc.*, 272 Ill. App. 3d 833, 835-36, 651 N.E.2d 708, 710 (1995). We take as true all well-pleaded facts and draw all reasonable inferences in favor of the plaintiff. *Sherman*, 272 Ill. App. 3d at 835, 651 N.E.2d at 710; *Ziemba v. Mierzwa*, 142 Ill. 2d 42, 46-47, 566 N.E.2d 1365, 1366 (1991). In evaluating the propriety of the trial court's action, we apply the rule that dismissal is only appropriate if it is clear that the plaintiff can prove no set of facts that

would entitle him or her to recover. *Illinois Graphics Co. v. Nickum*, 159 Ill. 2d 469, 483, 639 N.E.2d 1282, 1289 (1994); *Wheeler v. Caterpillar Tractor Co.*, 108 Ill. 2d 502, 505-06, 485 N.E.2d 372, 374 (1985).

■ According to the at-will employment doctrine, adopted in this country in the late nineteenth century (82 Am. Jur. 2d *Wrongful Discharge* §§ 2, 7 (1992); Note, *Protecting At Will Employees Against Wrongful Discharge: The Duty to Terminate Only in Good Faith*, 93 Harv. L. Rev. 1816, 1824 (1980)), an employer may fire an at-will employee for any or no reason (*Howard v. Zack Co.*, 264 Ill. App. 3d 1012, 1021, 637 N.E.2d 1183, 1190 (1994)). The tort of retaliatory discharge is a narrow exception to this rule, based on the principle that "parties to a contract may not incorporate in it rights and obligations which are clearly injurious to the public." *Palmateer v. International Harvester Co.*, 85 Ill. 2d 124, 129, 421 N.E.2d 876, 878 (1981). The law in this area aims to strike a proper balance among employers' interests in operating their businesses efficiently, employees' interests in earning a livelihood and society's interests in seeing its public policies carried out. *Palmateer*, 85 Ill. 2d at 129, 421 N.E.2d at 878.

■ In order to make out a claim for retaliatory discharge, a plaintiff must allege: (1) that he or she has been discharged; (2) in retaliation for his or her activities; and (3) that the discharge violates a clear mandate of public policy. *Howard*, 264 Ill. App. 3d at 1021-22, 637 N.E.2d at 1190. According to the University, Stebbings has not adequately pleaded the third element, because he has not pleaded the existence of a clearly mandated public policy that applies to his situation, and that, even if he has, he has not adequately pleaded that his firing in fact violated any such policy.

Relative to the meaning of "public policy" in this context, the Illinois Supreme Court has commented:

> "There is no precise definition of the term. In general, it can be said that public policy concerns what is right and just and what affects the citizens of the State collectively. It is to be found in the State's constitution and statutes and, when they are silent, in its judicial decisions. [Citation.] Although there is no precise line of demarcation dividing matters that are the subject of public policies from matters purely personal, a survey of cases in other States involving retaliatory discharges shows that a matter must strike at the heart of a citizen's social rights, duties, and responsibilities before the tort will be allowed." *Palmateer*, 85 Ill. 2d at 130, 421 N.E.2d at 878-79.

The first policy recognized by our supreme court as the basis for a retaliatory discharge claim was the public policy favoring the exercise of worker's compensation rights. *Kelsay v. Motorola, Inc.*, 74 Ill. 2d

172, 384 N.E.2d 353 (1978). In *Palmateer v. International Harvester Co.*, 85 Ill. 2d 124, 421 N.E.2d 876 (1981), the court expanded the tort to protect "whistle-blowers," *i.e.*, those who report illegal or improper conduct. The plaintiff in *Palmateer* claimed that he was fired for reporting a possible criminal violation by a coworker and agreeing to cooperate with the police in the investigation of the alleged violation. The court held that public policy protected the "citizen crime fighter." *Palmateer*, 85 Ill. 2d at 132, 421 N.E.2d at 880. The court reasoned: "There is no public policy more basic, nothing more implicit in the concept of ordered liberty [citation], than the enforcement of a State's criminal code. [Citations.] There is no public policy more important or more fundamental than the one favoring the effective protection of the lives and property of citizens." *Palmateer*, 85 Ill. 2d at 132, 421 N.E.2d at 879. Accordingly, the court held, an employee should be able to report illegal activity without fear of discharge. *Palmateer*, 85 Ill. 2d at 132-33, 421 N.E.2d at 879.

In *Wheeler v. Caterpillar Tractor Co.*, 108 Ill. 2d 502, 511, 485 N.E.2d 372, 377 (1985), the court applied the tort of retaliatory discharge in a situation where a worker was fired for refusing to engage in conduct that violated public policy, as opposed to reporting an employer for violating the law. In *Wheeler*, a employee of Caterpillar Tractor Company claimed that he was fired for refusing to use a machine with radioactive material. He alleged that the unit was in a dangerous condition that violated federal safety regulations promulgated by the Nuclear Regulatory Commission. The supreme court recognized as a basis for his claim the policy of "protection of the lives and property of citizens from the hazards of radioactive material." *Wheeler*, 108 Ill. 2d at 511, 485 N.E.2d at 377. The court held that such a policy was enunciated in the federal Energy Reorganization Act of 1974 (42 U.S.C. § 2011 *et seq.* (1994)), and particularly in section 5851, which protects employees who report violations of the act (42 U.S.C. § 5851 (1994)). It added that this policy was as important and fundamental as the policy recognized in *Palmateer* of protecting the citizens from crimes of violence. *Wheeler*, 108 Ill. 2d at 511, 485 N.E.2d at 377.

## I

In the instant case, the University argues that Stebbings does not have a claim because the statutes and regulations he has cited as a basis for his claim do not apply to the research at Argonne. This argument requires some analysis, for there is more than one sense in which a retaliatory discharge claim might be precluded by the failure of cited law to apply.

■ Initially we note one sense in which the law does not need to apply. It is not necessary for a plaintiff attempting to state a claim for retaliatory discharge to cite to a statute making his or her firing illegal. If that were the case, the tort of retaliatory discharge would be superfluous, for the plaintiff would be able to proceed under the statute. In fact, a court might even be obligated to dismiss the claim in such a situation, for one of the factors that a court considers in deciding whether to allow a retaliatory discharge claim is the existence of an adequate alternative remedy. *Leweling v. Schnadig Corp.*, 276 Ill. App. 3d 890, 898, 657 N.E.2d 1107, 1112 (1995); *Fowler v. Great American Insurance Cos.*, 653 F. Supp. 692, 698 (N.D. Ill. 1987). The tort of retaliatory discharge was not intended to serve as a substitute means for enforcement of particular laws. *Fowler*, 653 F. Supp. at 694. Rather, "[i]t was intended to neutralize the power potentially available to employers to frustrate the state policies underlying those laws. See *Palmateer v. International Harvester Co.*, 85 Ill. 2d 124, 129, 52 Ill. Dec. 13, 15, 421 N.E.2d 876, 878 (1981) (unchecked employer power presents a distinct threat to public policy)." *Fowler*, 653 F. Supp. at 694.

■ We agree that in some sense the law cited by the plaintiff must apply in any retaliatory discharge suit. And in the "citizen crime fighter" type of claims, there is an additional sense in which law cited must apply. For all retaliatory discharge claims, the law (be it a statute, constitutional provision or judicial decision) that the plaintiff adduces as the basis of the public policy must apply in that it must enunciate a public policy that plainly covers the situation to which the plaintiff objects. For a "citizen crime fighter" type of retaliatory discharge claim, there must also be law that applies, in that the employee believes in good faith that it is being violated.

Initially we will look at Stebbings' suit insofar as it is *not* a "citizen crime fighter" type of retaliatory discharge action.

## A

Stebbings first argues that his firing violates the public policy behind *Wheeler* and section 5851 of the Energy Reorganization Act (42 U.S.C. § 5851 (1994)) of protecting the lives and property of citizens from the hazards of radioactive material. He adds that this policy is also demonstrated in the following state statutes: Personnel Radiation Monitoring Act (420 ILCS 25/0.01 *et seq.* (West 1996)); the Radiation Installation Act (420 ILCS 30/0.01 *et seq.* (West 1996)); the Radon Mitigation Act (420 ILCS 50/1 *et seq.* (West 1996)); and the Radiation Protection Act of 1990 (420 ILCS 40/1 *et seq.* (West 1996)).

■ The Radon Mitigation Act provides in part:

"The General Assembly finds that it is in the interest of the People of Illinois to establish a comprehensive program for determining the extent to which radon and radon progeny *** pose a potential risk to [people in Illinois] and for determining what measures can be taken to reduce and prevent such risk." 420 ILCS 50/2 (West 1996).

And the Radiation Protection Act of 1990 states:

"[I]t is hereby declared to be the public policy of this State to encourage the constructive uses of radiation and to prohibit and prevent exposure to ionizing radiation in amounts which are or may be detrimental to health." 420 ILCS 40/2 (West 1996).

We agree that these sources establish a clearly mandated public policy of the protection of the lives and property of citizens from the hazards of radioactive material.

The University argues, however, that Stebbings cannot invoke this policy because none of the statutes offered as the source of the policy applies to the work at Argonne. In our view, however, the statutes do not need to apply in this sense. The University cites *Barr v. Kelso-Burnett Co.*, 106 Ill. 2d 520, 478 N.E.2d 1354 (1985), to support its position that the law cited as the source of the public policy must regulate the relationship between the employer and employee in order for the employee to have a claim. In *Barr*, the plaintiffs alleged that they were fired for speaking with fellow employees about layoff procedures being used by their employer. The plaintiffs claimed that their discharge violated, *inter alia*, a policy in favor of free speech that they identified in the United States and Illinois Constitutions. The court rejected the plaintiffs' complaint, holding that a clearly mandated public policy had not been violated.

■ But the grounds the *Barr* court ultimately gave for its decision was that the plaintiffs' discharge did not violate the public policy, not that it did not violate the constitutional provisions given as the source of the policy. *Barr*, 106 Ill. 2d at 528, 478 N.E.2d at 1357. The court noted that "[t]he test for determining if the complaint states a valid cause of action is whether the public policy clearly mandated by the cited provisions is violated by the plaintiff's discharge. [Citation.] The application of this test necessarily involves determining what the public policy is behind the enactment or adoption of the particular provision." *Barr*, 106 Ill. 2d at 527, 478 N.E.2d at 1357.

An instructive case in this regard is *Fredrick v. Simmons Airlines, Inc.*, 144 F.3d 500 (7th Cir. 1998). The plaintiff in *Fredrick* was an airline pilot who alleged that he was fired for attempting to warn people concerning an unsafe model of airplane used by the airline for which he worked. He filed suit alleging retaliatory discharge, *inter*

*alia.* The plaintiff contended that his firing was contrary to the state public policy of providing safe air travel, as expressed in the Illinois Aeronautics Act (620 ILCS 5/1 *et seq.* (West 1996)). Section 42 of the Illinois Aeronautics Act declares that "[t]he general public interest and safety, the safety of persons operating, using, or traveling in, aircraft, and of persons and property on the ground, and the interest of aeronautical progress requir[e] that aircraft operated within this State should be airworthy." 620 ILCS 5/42 (West 1996). The federal district court dismissed the suit for failure to state a claim on which relief could be granted, and the plaintiff appealed.

The defendant had contended that the plaintiff should not be able to invoke the policy expressed in the Illinois Aeronautics Act because the act did not apply to aircraft engaged in interstate or international commercial flights, as were the airplanes concerning which the plaintiff complained. Therefore, the defendant asserted, the public policy behind the Illinois Aeronautics Act was not available to the plaintiff. The seventh circuit rejected this argument and reversed the dismissal. *Fredrick*, 144 F.3d at 504-05.

The general public policy declared by the statute in *Fredrick* that airplanes operated in Illinois should be airworthy was not limited to the particular airplanes on which the Illinois Aeronautics Act placed regulations. In the same way, *Wheeler* and the statutes cited by Stebbings declare a general policy of protecting Illinois citizens from the hazards of radioactive material. This policy is not limited to the particular people who work in the environments regulated by the laws.

Unless pleading a "citizen crime fighter" rationale, the plaintiff must only show that the conduct complained of contravenes a clearly mandated public policy, not necessarily a law. Stebbings was not required to plead that any of the statutes dealing with radiation made the overexposure that he tried to report illegal, except insofar as he might be arguing that he was a citizen crime fighter for trying to report it. While, given the importance and general recognition of the "citizen crime fighter" policy, a court's duty will seldom be clearer than when the violation of a criminal statute is involved (*Wagenseller v. Scottsdale Memorial Hospital*, 147 Ariz. 370, 380, 710 P.2d 1025, 1035 (1985), *superceded by statute as stated in Chaboya v. American National Red Cross*, 72 F. Supp. 2d 1081 (D. Ariz. 1999), and citing *Palmateer*, 85 Ill. 2d at 132, 421 N.E.2d at 879), it is not necessarily a requirement of a valid retaliatory discharge claim that the conduct that the employee reports or refuses to engage in be illegal. In *Wheeler*, for instance, despite the fact that the condition of the machine was allegedly in violation of federal regulations, the *Wheeler* court based its ruling on the policy of protecting citizens from radiation, rather than

the policy of protecting them from crime. *Wheeler*, 108 Ill. 2d at 511, 485 N.E.2d at 377. The tort of retaliatory discharge protects whistleblowers who expose "illegal *or improper* conduct." (Emphasis added.) *Howard*, 264 Ill. App. 3d at 1022, 637 N.E.2d at 1190.

■ In the instant case, we think the policy behind *Wheeler* is thwarted by discharging an employee for reporting radiation hazards. The *Wheeler* court held that protecting citizens from the hazards of radiation was just as important a public policy as protecting them from crime. *Wheeler*, 108 Ill. 2d at 511, 485 N.E.2d at 377. Accordingly, in our view, it is as contrary to public policy to fire an employee for reporting radiation hazards as it is to fire an employee for reporting a crime. The fact that Stebbings did not succeed in making a report to the NIH before he was discharged does not undermine his claim. *Sherman*, 272 Ill. App. 3d at 839-40, 651 N.E.2d at 535.

## B

■ By contrast, Stebbings has not shown that the policy behind "informed consent" law was violated. Stebbings claims that his firing violated a clear public policy favoring the protection of human subjects participating in medical and health research, in accord with the principle of informed consent. As a basis for this policy he cites various court cases discussing informed consent, as well as a federal statute (42 U.S.C. § 289 (1994)). It is not necessary for us to decide whether these sources establish a clearly mandated policy of informed consent in medical research, for Stebbings has not adequately alleged that such a policy was violated. According to the complaint, the test subjects were fully informed concerning the planned experiments and they gave their consent. It is true that the subjects were allegedly exposed to significantly more radiation than they had agreed to on at least one occasion. But Stebbings has not claimed either that the overexposure was intentional or that the overexposure was a foreseeable risk concerning which the University failed to warn the subjects. Thus, the University's conduct as alleged does not violate principles of informed consent. See *Mink v. University of Chicago*, 460 F. Supp. 713, 716-18 (N.D. Ill. 1978). Accordingly, informed consent cannot serve as the basis for Stebbings' claim.

## II

■ Next we examine Stebbings' complaint insofar as it is a "citizen crime fighter" type of complaint. As mentioned above, in a "citizen crime fighter" type of retaliatory discharge claim, two layers of law are involved. First, there must be statutes, constitutional provisions, or judicial decisions that clearly mandate a public policy in favor of the reporting of crime. As it happens, in light of *Palmateer*, there is

little question that such a policy has been clearly mandated and so this layer of law will rarely be at issue in a "citizen crime fighter" suit. Second, there is the layer of law that allegedly prohibits the conduct that the employee reports or refuses to engage in. This layer of law must apply in that the employee must have a good-faith belief that it prohibits the conduct in question. It does not need to apply in the sense of providing a clearly mandated public policy. The public policy in favor of citizen crime fighters is established by law such as *Palmateer* and its progeny.

The University, in addition to arguing that a *Wheeler* type of claim is inapplicable because the radiation statutes do not apply, also argues that a "citizen crime fighter" type of claim is inapplicable because the law cited for this second layer does not apply to the work at Argonne. We disagree.

The complaint in the instant case adequately states a claim for retaliatory discharge under the "citizen crime fighter" model. Stebbings alleges that he "blew the whistle" to the administration at Argonne and was fired for doing so. In particular, he alleges that the University was not in compliance with the law in its failure to file a report with the NIH about the overexposure incident. Federal regulations required the University to file an assurance that it would do certain things (45 C.F.R. § 46.103 (1997)), and the University did not file such a document. Stebbings alleges that under the assurance the University was required to report promptly to the NIH "any unanticipated problems involving risks to subjects or others." Stebbings claims that he was fired for telling this to the administration at Argonne.

The University responds, first, that the regulations and the assurance were not violated because they did not apply to the research that is the subject of this suit. However, what matters is that Stebbings believed in good faith that the University was violating federal regulations. *Howard*, 264 Ill. App. 3d at 1024, 637 N.E.2d at 1192. The plaintiff need not plead facts that conclusively show such a violation. *Johnson v. World Color Press, Inc.* 147 Ill. App. 3d 746, 751, 498 N.E.2d 575, 578 (1986). A reasonable person could interpret the regulations, as Stebbings allegedly did, as covering the research at Argonne.

According to the University, however, Stebbings has not shown a basis for a good-faith belief that a report was necessary even under *his* interpretation of the assurance. In order to trigger the duty to report under the assurance, as read by Stebbings, there must be an unanticipated problem involving a risk. The University argues, however, that he has not alleged any facts that could form the basis of a good-faith belief that there was some risk to the subjects. We disagree. Although the complaint ideally could have been more specific as

to the nature of the alleged risks to the subjects from the radiation, we draw reasonable inferences in favor of the plaintiff. *Sherman*, 272 Ill. App. 3d at 835, 651 N.E.2d at 710. According to the complaint, when the DOE heard of the overexposure incident it shut down human subject research in the entire national laboratory system. In our view, this would be a sufficient basis for a good-faith belief that there had been a risk to the subjects and, hence, that a report to the NIH was required under the assurance and federal regulations.

Although the situation in the instant case differs in many respects from that in *Palmateer*, we do not think these differences preclude a claim. For instance, although Stebbings did not tell government authorities about the University's allegedly improper failure to file a report with the NIH, reporting to superiors in a company as well as to outside authorities is protected. *Petrik v. Monarch Printing Corp.*, 111 Ill. App. 3d 502, 508, 444 N.E.2d 588, 592-93 (1982); *Lanning v. Morris Mobile Meals, Inc.*, 308 Ill. App. 3d 490, 720 N.E.2d 1128 (1999).

Moreover, it does not matter that the regulations that Stebbings alleged were violated were federal and not state regulations. "[A]n Illinois citizen's obedience to the law, including Federal law, is a clearly mandated public policy of this State under the principles enunciated in *Wheeler*." *Russ v. Pension Consultants Co.*, 182 Ill. App. 3d 769, 776, 538 N.E.2d 693, 697 (1989). For instance, in *Johnson v. World Color Press, Inc.*, 147 Ill. App. 3d 746, 498 N.E.2d 575 (1986), the plaintiff alleged that he was discharged for telling his employer that certain accounting practices in which the company was engaging violated federal securities law. The court held that the plaintiff had stated a valid retaliatory discharge claim. *Johnson*, 147 Ill. App. 3d at 749-50, 498 N.E.2d at 576-77; see also *Sherman*, 272 Ill. App. 3d at 839, 651 N.E.2d at 712 (plaintiff stated a claim when he alleged that his employer fired him to prevent him from reporting a violation of regulations promulgated by the Occupational Safety and Health Administration).

Finally, the fact that the violation reported was not, as in *Palmateer*, a violation of the Criminal Code of 1961 (720 ILCS 5/1—1 *et seq.* (West 1996)) does not thwart Stebbings' claim. The tort of retaliatory discharge will protect the reporting of any violation of the Criminal Code, be it as minor as the theft of a $2 screwdriver. *Palmateer*, 85 Ill. 2d at 133-34, 421 N.E.2d at 880; *Belline v. K-Mart Corp.*, 940 F.2d 184, 188 (7th Cir. 1991). But the tort can also protect the reporting of the violation of regulations and statutes other than the Criminal Code. The University cites language that seems to indicate the contrary in *Nappi v. Meridian Leasing Co.*, 859 F. Supp. 1177, 1180 (N.D. Ill. 1994). Insofar as *Nappi* suggests that only employees who report viola-

tions of the Criminal Code are protected, we must respectfully disagree. There are numerous examples of Illinois courts allowing retaliatory discharge suits for those who report noncriminal violations. See, *e.g.*, *Paskarnis v. Darien-Woodbridge Fire Protection District*, 251 Ill. App. 3d 585, 623 N.E.2d 383 (1993); *Howard v. Zack Co.*, 264 Ill. App. 3d 1012, 637 N.E.2d 1183 (1994).

Courts are most likely to grant relief if the noncriminal regulations or statutes involved in retaliatory discharge suits involve health and safety. For instance, a health code regulation was held to be sufficient in *Lanning v. Morris Mobile Meals, Inc.*, 308 Ill. App. 3d 490, 720 N.E.2d 1128 (1999), and in *Sherman v. Kraft General Foods, Inc.*, 272 Ill. App. 3d 833, 651 N.E.2d 708 (1995), regulations about asbestos in the workplace were held sufficient. But in *Leweling v. Schnadig Corp.*, 276 Ill. App. 3d 890, 657 N.E.2d 1107 (1995), a Federal Interstate Commerce Act (49 U.S.C. § 10101(a)(8) (1988)) provision was held insufficient, and in *Fowler v. Great American Insurance Cos.*, 653 F. Supp. 692, 698 (N.D. Ill. 1987), an Illinois Insurance Code (see 215 ILCS 5/1 *et seq.* (West 1996)) provision was held insufficient. Courts may grant relief, however, even if the statute or regulation does not deal with health and safety. See *Russ v. Pension Consultants Co.*, 182 Ill. App. 3d 769, 776, 538 N.E.2d 693, 697 (1989) (federal tax law); *Johnson v. World Color Press, Inc.*, 147 Ill. App. 3d 746, 498 N.E.2d 575 (1986) (federal securities law).

In the instant case, the purpose of the regulations allegedly violated relates to the health and safety of citizens. "Illinois courts have consistently held that policies affecting the health and safety of citizens will support a retaliatory discharge claim." *Leweling*, 276 Ill. App. 3d at 894, 657 N.E.2d at 1109-10. Even if regulations deal most immediately with record keeping and reporting, they still may have major consequences for health and safety issues. *Howard*, 264 Ill. App. 3d at 1023, 637 N.E.2d at 1191.

For the foregoing reasons, we reverse and remand the judgment of the circuit court.

Reversed and remanded.

McNULTY and McBRIDE, JJ., concur.