IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| LISA NOLAN, | ) | |
| | ) | No. 37904-3-III |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| TEKOA OPERATIONS, LLC, dba TEKOA | ) | |
| CARE CENTER, a Washington State Limited | ) | |
| Liability Corporation, | ) | |
| | ) | |
| Respondent. | ) | |

FEARING, J. — The trial court granted employer Tekoa Care Center summary judgment dismissal of employee Lisa Nolan's claims of disability discrimination, wrongful discharge for reporting violation of disability discrimination laws, and wrongful discharge for reporting unlawful conduct of the employer. Because of genuine disputes of material fact, we reverse the order of dismissal.

FACTS

Tekoa Operations, LLC, dba Tekoa Care Center (TCC) operates a nursing home. Lisa Nolan periodically worked for TCC as a licensed practical nurse (LPN). Her duties included supervising certified nursing assistants (CNAs). TCC last rehired Nolan in March 2017.

Lisa Nolan suffers from asthma, high blood pressure, and chronic obstructive pulmonary disease (COPD). COPD is an inflammatory lung disease that causes difficult breathing. Nolan used an inhaler while working. Nolan also endures posttraumatic stress disorder (PTSD), as a result of being locked in a garage and beaten for eight hours and also being held hostage with her children in a bedroom for three days. TCC staff, including Nolan's supervisors, knew of her medical conditions.

TCC, through Director of Nursing Services (DNS) Tiffany Beutler and her predecessor, granted workplace accommodations for Lisa Nolan's health conditions. Nolan admits that TCC permitted her to exercise short breaks as needed to catch her breath. Nevertheless, according to CNA Mkenna Willey, Nolan generally took no more breaks than other workers.

According to charge nurse LPN Mary Ward, Nolan worked diligently and competently. CNA Mkenna Willey described Nolan as an "excellent nurse," who "worked above and beyond for the nursing home." Clerk's Papers (CP) at 93.

TCC trained Lisa Nolan to maintain records of hours worked by nurses. Nolan's responsibilities included ensuring that CNAs she supervised received two fifteen-minute breaks and a thirty-minute lunch break during a shift. TCC's policies required that, when an employee failed to utilize a scheduled break, the supervisor write on the time record that the employee worked during the break. TCC paid its staff for missed meal periods.

2

TCC staff encountered difficulty exercising breaks due to the continuous demands of their jobs. When staff lacked time for breaks, including lunch breaks, Lisa Nolan informed management of noncompliance with the law. TCC charge nurse Mary Ward confirmed that TCC staff often missed breaks due to work demands and that Nolan complained at staff meetings about the lack of rest periods.

In October 2017, Lisa Nolan experienced an unidentified medical event at home. Nolan journeyed to TCC for assistance, where she met with TCC staff, including Tiffany Beutler. After speaking with Nolan's doctor and care team, Beutler drove Nolan home. The following morning, Nolan visited the emergency room for a follow-up appointment. Nolan went on medical leave for ten days. Nolan returned to work on November 8, 2017.

According to TCC Operations Manager Asher Davison, he learned, in early November 2017, that Lisa Nolan pre-signed time sheets before an employee's lunch period, contrary to Nolan's training. Nolan's premature signing of a time sheet could result in an employee exercising a lunch break while also being paid for purportedly working during the break.

On Friday, November 10, Lisa Nolan received her paycheck and noticed a cut in pay. On that day, Nolan met with DNS Tiffany Beutler and Operations Manager Asher Davison to discuss the missing pay. Nolan avers in a declaration that Beutler then informed her that TCC reduced her pay because of Nolan's periodic medically necessary breaks.

3

In a declaration, TCC Operations Manager Asher Davison testified that TCC reduced Lisa Nolan's pay because of a creditor's garnishment. Davison attached, to his declaration, the garnishment notice TCC received, records of Nolan's time sheets, and documents showing the pay she received. The attached records showed that TCC deducted sums from Nolan's paychecks only for the garnishment, not for any extra breaks.

During the November 10 meeting among Asher Davison, Tiffany Beutler, and Lisa Nolan, Davison confronted Nolan about allegedly pre-signing time sheets. Nolan denied pre-signing any time sheet. During the meeting, Nolan confronted Asher Davison about TCC purportedly conducting an illegal raffle that incentivized staff to forego rest breaks for a chance to win money. The meeting grew heated.

Tiffany Beutler, Asher Davison, and Lisa Nolan disagree as to how the November 10 meeting ended. According to Nolan, she left the conference after uttering: "'I'm not going to do this. I can't fucking do this.'" CP at 98. Nolan asserts that she did not direct the coarse words to either Davison or Beutler. Nolan felt her blood pressure rising and worried about a stroke or an aneurism.

According to Asher Davison, Lisa Nolan abruptly left the meeting after shouting "'I'm fucking done, fuck him and fuck you.'" CP at 30. Following the meeting, Tiffany Beutler wrote a note describing the meeting in part:

Lisa [Nolan] very quickly escalated and started yelling and then walked out of my office. I, DNS followed her to her car and she said "I'm fucking done, fuck him and you!"

CP at 42. Whereas Davison and Beutler agree as to the words voiced by Nolan, Davison places the words inside the meeting room and Beutler sites the words in a parking lot outside the nursing home. According to Beutler, Nolan went directly from the meeting to her car in the parking lot and Beutler followed her.

Asher Davison's notes, about the November 10 convocation, stated that Tiffany Beutler informed Lisa Nolan, during the meeting, that, if Nolan left the premises, TCC would deem her to have abandoned her position. Beutler's notes similarly indicated that she warned Nolan that her leaving would constitute abandonment.

A fourth witness disagrees with Tiffany Beutler that Lisa Nolan went immediately to Nolan's car when ending the November 10 meeting. Charge nurse Mary Ward, in a declaration, averred that Nolan, after the meeting, returned to work beside Ward, who supervised the ward in which Nolan worked that day.

Lisa Nolan, when returning to the ward, announced: "'Let's count the narcotics.'" CP at 89. According to Ward, "Nolan was unsettled, not thinking clearly, short of breath, and red in the face." CP at 89. Nolan shook while attempting to unlock a medication cart. She could not unlock the cart.

Mary Ward worried that Nolan's health was in jeopardy and directed Nolan to leave work. Nolan wished to continue to work. Supervisor Ward told Nolan that she

would retrieve someone to cover Nolan's shift. Ward maintained that, as a charge nurse, she possessed authority to send Nolan home. In a summary judgment declaration, Lisa Nolan averred that she did not intend to abandon or quit her job, but followed supervisor Ward's directions.

Mary Ward went to Tiffany Beutler's office and informed Beutler that she had sent Lisa Nolan home because of her physical condition. According to Ward, Beutler did not leave her office to speak with Nolan in the parking lot until after Ward informed her of Nolan's condition. Ward watched Beutler leave her office and walk to the parking lot.

In a deposition, Lisa Nolan avowed that Tiffany Beutler approached her in the parking lot and informed her that Asher Davison would require her to "'call in and say you [Nolan] abandoned your residents.'" CP at 100. In response, Nolan said, "'[a]re you going to do that to me?'" CP at 100. Beutler replied: "'Lisa, I'm not going to do that to you. Just go home, I'll cover your shift, and we'll talk about it on Monday.'" CP at 100.

According to supervisor Mary Ward, Tiffany Beutler returned inside the building after speaking to Lisa Nolan. Beutler then volunteered to Mary Ward to finish Nolan's shift. Nevertheless, another nurse covered for Nolan.

Lisa Nolan journeyed to a local clinic and discovered that her "blood pressure was through the roof." CP at 130. Nolan believes she would have encountered a major medical event if she had not left work early on November 10.

6

On Sunday, November 12, 2017, Lisa Nolan messaged Tiffany Beutler on Facebook. Nolan inquired whether she had been fired. We quote the message without any correction of spelling or grammar errors:

> Well I haven't heard from you so I will be in for my shift tomorrow at 2, if im fired just say so now so I dont hace to get pushed into a corner with some angry man blocking my only exit My PTSD can't handle that, its fight or flight in that situation for me and luckily I chose to fly I will not allow Ashers fucked up bottom line be my fault To be honest I was all for the drawing weekly thing until one of my r n s actually talked me out of it. And no I never presigned anyones time sheet that's a bullshit lie and there had better be some proof.

CP at 110.

On November 13, Tiffany Beutler responded to Lisa Nolan's Facebook communication. Beutler wrote that she called Nolan, but left a voicemail because of no answer. In a later message on November 13, Beutler typed: "you walked off, you have been released." CP at 110. Nolan responded:

> your last statement was go home I will cover your shift we will work it out on Monday.

CP at 110.

In a report to the Washington Department of Health Nursing Care Quality Assurance Commission, TCC reported that Lisa Nolan abandoned her post. TCC filed charges of abandonment of patients against Nolan with the state nursing board. According to Nolan, after TCC terminated her employment and after she learned of TCC's filing of charges with the nursing board, her health worsened.

On November 17, 2017, Lisa Nolan filed for Social Security Disability Insurance (SSDI) benefits. In her application for benefits, she wrote that she "became unable to work because of [her] disabling condition on November 9, 2017." CP at 181. She added that she remained disabled. With the application, Nolan affirmed that a false statement in the application constituted a federal crime. She affirmed that the information provided on her application was true.

In this lawsuit, Lisa Nolan avers that she applied for SSDI benefits shortly after discharge from employment because she lost a $4,000 per month income and she believed the processing of her application would take five to eight years. According to Nolan, the Social Security Administration (SSA) took eight years to grant Nolan's husband's application for SSDI, despite his suffering from spina bifida. Despite filing for disability benefits, she intended to eventually return to part-time work. She believed she could work part-time and still receive Social Security benefits. She knew others that worked and received SSDI benefits.

A November 15, 2017 doctor's note declared that Lisa Nolan had a medical condition that precluded her from working until cleared by cardiology after further testing. A December 20, 2017 doctor's note read that Nolan could return to work. This second note listed a single work restriction: Nolan should have portable oxygen available.

On July 3, 2018, the SSA found Lisa Nolan disabled and granted her SSDI benefits. The SSA adjudged Nolan disabled as of November 9, 2017.

8

PROCEDURE

Lisa Nolan filed suit against TCC. Nolan alleges three causes of action, which we renumber from the complaint for purposes of efficiency: (1) disability discrimination in violation of RCW 49.60.180, a section of Washington's Law Against Discrimination (WLAD); (2) retaliation in violation of RCW 49.60.210(1), another section of the WLAD; and (3) wrongful termination of employment in violation of public policy. TCC moved for summary judgment on all three claims. The trial court granted TCC's motion and dismissed Nolan's three causes of action with prejudice.

LAW AND ANALYSIS

On appeal, Lisa Nolan seeks reversal of the summary judgment dismissal of all three of her causes of action.

Disability Discrimination

RCW 49.60.180 outlaws employment discrimination based on a disability in addition to employment discrimination based on age, sex, marital status, sexual orientation, race, creed, color, national origin, citizenship or immigration status, military status, and status as a discharged veteran. For purposes of handicap discrimination, RCW 49.60.180 declares:

> It is an unfair practice for any employer:
> . . . .
> (2) To discharge . . . any person from employment because of . . . the presence of any sensory, mental, or physical disability. . . .

(3) To discriminate against any person in compensation or in other terms or conditions of employment because of . . . the presence of any sensory, mental, or physical disability.

*Issue 1: Whether Lisa Nolan presents a question of fact that TCC failed to reasonably accommodate her disability?*

*Answer 1: Yes.*

Lisa Nolan contends that TCC discharged her from employment because of a disability. According to Nolan, TCC did not accommodate her need to leave work on November 10, when her supervisor sent her home because of her physical condition. She also asserts that TCC docked her pay because of her disability. The reduction in pay resulted from her break times exceeding the lawfully required times, but which greater time stemmed from her need to facilitate her COPD, asthma, and PTSD.

Lisa Nolan asserts the species of disability discrimination known as failure to reasonably accommodate. RCW 49.60.180(3) demands that an employer reasonably and affirmatively accommodate an employee with a disability unless the accommodation would pose an undue hardship. *Gibson v. Costco Wholesale, Inc.*, 17 Wn. App. 2d 543, 555, 488 P.3d 869, *review denied*, 497 P.3d 391 (2021); *LaRose v. King County*, 8 Wn. App. 2d 90, 125, 437 P.3d 701 (2019). An employee claiming his or her employer failed to accommodate a disability must prove that (1) the employee suffered from a disability, (2) the employee was qualified to do the job at issue, (3) the employee gave his or her employer notice of the disability, and (4) the employer failed to reasonably accommodate

that disability. *Mackey v. Home Depot USA, Inc.*, 12 Wn. App. 2d 557, 586, 459 P.3d 371, *review denied*, 195 Wn.2d 1031, 468 P.3d 616 (2020).

TCC agrees that Lisa Nolan suffered from disabilities and that it knew of the disabilities. Nevertheless, it argues that the undisputed facts show that it accommodated Nolan's medical conditions. TCC allowed Nolan short breaks throughout the day to catch her breath. TCC also permitted Nolan to take medical leave after a flare-up in her condition in late October. Finally, TCC contends that it did not discriminate against Nolan when terminating her employment because, during the November 10 meeting among Nolan, Tiffany Beutler, and Asher Davison, Nolan never informed TCC managers of the need to leave work.

TCC forwards an overly technical argument. We agree with TCC that the employee must inform the employer of the need for an accommodation. But that rule lacks resonance when the employee's supervisor, the authorized representative of the employer, sends the employee home from work because of the employee's disability and a need for an emergency accommodation of that disability. Charge nurse Mary Ward avers that she dismissed Lisa Nolan from her duties on the afternoon of November 10 because of Nolan's precarious condition. Nolan had intended to continue work duties.

TCC's summary judgment presentation presents the facts in a light favorable to it. Nevertheless, this court considers all facts and reasonable inferences in the glow most advantageous to the nonmoving party, Lisa Nolan. *Stout v. Warren*, 176 Wn.2d 263, 268,

290 P.3d 972 (2012). Summary judgment for an employer is seldom appropriate in employment discrimination cases because of the difficulty of proving discriminatory motivation. *Mikkelsen v. Public Utility District No. 1 of Kittitas County*, 189 Wn.2d 516, 527, 404 P.3d 464 (2017). Because a smoking gun rarely surfaces in a discrimination case, a plaintiff must usually prove her case through circumstantial evidence. *Currier v. Northland Services, Inc.*, 182 Wn. App. 733, 746-47, 332 P.3d 1006 (2014).

When we view the facts to the benefit of Lisa Nolan, a trier of fact could conclude that TCC discharged Nolan for leaving work on November 10 and her disability caused this departure. In turn, Director of Nursing Tiffany Beutler told Nolan, on that date, that Nolan could return to work. TCC management did not decide to terminate Nolan's employment until after she left work that day because of her medical condition.

TCC emphasizes that the employee must produce medical documentation indicating the need for the accommodation and Lisa Nolan never provided a physician's note that she needed to absence herself from work on November 10. *Johnson v. Chevron U.S.A., Inc.*, 159 Wn. App. 18, 29-30, 244 P.3d 438 (2010). But Nolan did not leave work on her own decision. Her TCC supervisor sent her home. That supervisor was a health professional. Nolan, a medical health provider, after departing from TCC's care facility on November 10, confirmed that her blood pressure was dangerously high.

*Issue 2: Whether TCC presents a legitimate reason for the employment termination that affords it summary judgment dismissal of the disability discrimination cause of action?*

*Answer 2: No. The facts present a question for the jury to decide as to whether TCC's stated reason was a pretext.*

If the plaintiff establishes a prima facie case for his or her discrimination claim, the employer may articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Mikkelsen v. Public Utility District No. 1 of Kittitas County*, 189 Wn.2d 516, 527 (2017). If the employer identifies a legitimate, nondiscriminatory reason for taking an adverse employment action, the employee still prevails if she establishes that the defendant's alleged nondiscriminatory reason for the adverse employment action was a pretext. *Mikkelsen v. Public Utility District No. 1 of Kittitas County*, 189 Wn.2d 516, 527 (2017). The employee may satisfy the pretext prong by offering evidence creating a genuine issue of material fact that the defendant's reason is pretextual or, even if the employer's stated reason is legitimate, discrimination was nevertheless a substantial factor motivating the employer to take adverse action. *Mikkelsen v. Public Utility District No. 1 of Kittitas County*, 189 Wn.2d at 527.

TCC contends it fired Lisa Nolan for abandoning her job against company policy. According to Asher Davison's declaration, Tiffany Beutler and he met with Nolan on November 10 to address her violation of company policy by pre-signing time sheets.

13

Davison testified that Nolan abruptly left the meeting after shouting "'I'm fucking done, fuck him and fuck you,'" referring to Davison and Beutler. CP at 30. Beutler's note regarding the incident, kept in the ordinary course of business, confirmed Davison's version of the events, although it indicated that Nolan did not directly curse at Davison or her until she spoke with Nolan outside the building. Asher Davison's notes made after the November 10 meeting stated that Tiffany Beutler informed Lisa Nolan TCC would consider her conduct job abandonment if she left the premises. Beutler echoes this assertion.

TCC again pretends that Lisa Nolan presents no countervailing facts. Nolan denied pre-signing time sheets. During the meeting, Nolan confronted Asher Davison about TCC conducting an illegal raffle that incentivized staff to forego rest breaks for a chance to win money. According to Nolan, she left the conference after uttering: "'I'm not going to do this. I can't fucking do this.'" CP at 98. She did not direct the coarse words to either Davison or Beutler. Nolan felt her blood pressure rising and worried about a stroke or an aneurism. Nolan did not abandon the work premises. She instead returned to her work duties.

TCC supervisor Mary Ward confirms the testimony of Lisa Nolan. When Nolan returned to her duties after the meeting with Asher Davison and Tiffany Beutler, charge nurse Ward adjudged Nolan's health to be in jeopardy and directed Nolan to leave work. Nolan wished to continue to work. Ward persisted. Ward insists that, as a charge nurse,

14

she possessed authority to send Nolan home.  TCC does not dispute Ward's assertion.

Mary Ward went to Tiffany Beutler's office and informed Beutler that she had sent Lisa

Nolan home because of her physical condition.  Beutler then approached Nolan in the

parking lot and informed Nolan she would not be discharged from work and that Beutler

would complete Nolan's shift.  According to Mary Ward, Beutler volunteered to

complete Nolan's shift.

*Issue 3: Whether Lisa Nolan's application for SSDI benefits estops her from asserting, in her disability discrimination suit, that she could perform the essential functions of her job as a nurse?*

*Answer 3: No.*

The employee, in a disability discrimination suit, must show that she was qualified

and capable to perform her job.  *Mackey v. Home Depot USA, Inc.*, 12 Wn. App. 2d 557,

586 (2020).  In addition to asserting that it reasonably accommodated Lisa Nolan and that

Nolan never informed TCC of the need to leave work on November 10, TCC contends

that, as a matter of law, Nolan cannot prevail on her reasonable accommodation claim

because she declared in her SSDI application that she is unable to work.  According to

TCC, this assertion under federal penalty prevents her from now contending otherwise.

Based on a persuasive United States Supreme Court case in an Americans with

Disabilities Act suit, we disagree.

TCC relies on *Stevens v. City of Centralia*, 86 Wn. App. 145, 936 P.2d 1141 (1997). Centralia City Light terminated Gary Stevens' employment after Stevens exhausted his allotted sick leave. Stevens sued for disability discrimination. Thereafter, he applied for disability benefits with the SSA. In his application, he averred he could not work because of his disabling condition as of the date of his discharge by City Light. A SSA administrative law judge granted Stevens' claim. This court granted summary judgment dismissal of Stevens' reasonable accommodation claim. This court noted that the claimant must show qualifications for the job in order to sustain a disability accommodation suit. This court held that Stevens could not establish a prima facie case due to the collateral estoppel effect of the previous finding that he was completely disabled and unable to perform any kind of gainful employment at the time of his discharge.

Lisa Nolan relies on *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 802-03, 119 S. Ct. 1597, 143 L. Ed. 2d 966 (1999), in which the United States Supreme Court held that the law does not necessarily estop a claimant, in a reasonable accommodation claim under the Americans with Disabilities Act, from asserting the ability to perform the essential functions of her former job despite an award of SSDI benefits thereafter. In an astute unanimous opinion, the Court held that the claimant, to survive a summary judgment motion, must explain why her affirmation before the SSA is

16

consistent with her disability claim that she could perform the essential functions of her previous job at least with reasonable accommodation.

The United States Supreme Court, in *Cleveland v. Policy Management Systems Corp.*, observed that the Social Security Act and the Americans with Disabilities Act (ADA) both serve disabled individuals but in diverse ways. The Social Security Act provides monetary benefits to every insured individual "under a disability." 42 U.S.C. § 423(a)(1). The ADA prohibits employers from discriminating against an individual with a disability because of the disability. 42 U.S.C. § 12112(a). The court reasoned that the question of a disability under both acts does not entail a purely factual question, but rather, in part, comprises a context-related legal conclusion. An individual, in many situations, could be disabled for purposes of the Social Security Act, but not for the ADA. Therefore, an avowal that one is disabled for purposes of SSDI benefits should not preclude one from denying she was capable of working at her earlier job at the time of her discharge. Nor should a court impose a rebuttable presumption that a claim for Social Security disability precludes an assertion that one can perform the essential functions of her recent employment with reasonable accommodation. The SSA does not take into account the possibility of a reasonable accommodation. Also, the SSA often awards an applicant SSDI benefits based on a lengthy list of impairments regardless of the applicant's work capabilities. The nature of an individual's disability may change over time such that a statement of disability at the time of application for benefits may not

reflect the individual's capacities at the time of discharge from employment. The high court did not mention that the individual may be desperate for money such that she applies for government benefits, despite an unlikelihood of being found disabled by the SSA. The Court did, however, mention the general rule that a party may pursue inconsistent claims.

Still, the United States Supreme Court, in *Cleveland v. Policy Management Systems*, did not allow the claimant free reign to claim disability for purposes of SSDI benefits, but not for purposes of employment discrimination. In some cases, a SSDI claim may genuinely conflict with an ADA claim. In response to a summary judgment motion, the ADA claimant bears the burden of proving that she can, with or without reasonable accommodation, perform the essential functions of the job. The plaintiff cannot ignore the apparent contradiction of a SSDI application that avers she is unable to work. She must proffer a sufficient explanation. The Court remanded for a determination by the lower courts without listing any satisfactory explanations.

*Cleveland v. Policy Management Systems* softens the rule in *Stevens v. City of Centralia*, which automatically affords the employer summary judgment in a reasonable accommodation case when the employee applied for SSDI benefits. We expect that, if confronted with this question, the Washington Supreme Court will adopt the judicious *Cleveland* rule for purposes of the WLAD. Washington courts look to federal precedence for guidance in employment discrimination cases. *Burchfiel v. Boeing Corp.*, 149 Wn.

18

App. 468, 481 n.2, 205 P.3d 145 (2009). Therefore, we analyze whether Lisa Nolan supplied the superior court, in this suit, a sufficient explanation as to why she claims she could work at the time of her discharge, but claimed she was incapable of work when applying for SSDI benefits.

Although a trier of fact could conclude that Lisa Nolan's explanation lacks cogency, we discover some kernels of coherence in Nolan's rationalization. Nolan stated in her declaration that she believed she could apply for SSDI benefits and still seek to return to work. She desired to return to work. Nolan also believed she could work part-time and still receive Social Security benefits. She backed these averments with her avowal that she knew others that worked and received SSDI benefits. The United States Supreme Court, in *Cleveland v. Policy Management Systems, Corp.*, recognized that some individuals work while receiving Social Security benefits. 526 U.S. 795, 825.

*Cleveland v. Policy Management Systems, Corp.* recognizes that the question of disability for purposes of Social Security does not factor in reasonable accommodations. In December 2017, Lisa Nolan's physician signed a note stating she could return to work with the accommodation of a portable oxygen machine. Finally, *Cleveland v. Policy Management Systems, Corp.* recognizes that the date of application for SSDI will differ from the date of the alleged discrimination. Although Nolan claimed her disability began on November 9, she signed her Social Security application on November 17, seven days

after her purported termination from employment. Lisa Nolan testified, in her declaration, her medical condition worsened after termination from employment.

## Retaliation

We now address Lisa Nolan's cause of action for retaliation under the WLAD. RCW 49.60.210 declares:

> (1) It is an unfair practice for any employer, employment agency, labor union, or other person to discharge, expel, or otherwise discriminate against any person because he or she has opposed any practices forbidden by this chapter, or because he or she has filed a charge, testified, or assisted in any proceeding under this chapter.

To establish a prima facie case of retaliation under WLAD, the employee must demonstrate: (1) the employee took a statutorily protected action, (2) the employee suffered an adverse employment action, and (3) a causal link between the employee's protected activity and the adverse employment action. *Cornwell v. Microsoft Corporation*, 192 Wn.2d 403, 411, 430 P.3d 229 (2018). An employee can satisfy her burden of establishing a prima facie case of retaliation based on the proximity in time between the employee's protected activity and their termination. *Cornwell v. Microsoft Corporation*, 192 Wn.2d 411 415-16 (2018); *Mackey v. Home Depot USA, Inc.*, 12 Wn. App. 2d 557, 583 (2020).

Lisa Nolan maintains that she engaged in the protected activity of complaining to TCC management regarding its choice to dock her pay due to her extra, medically-necessary breaks. Nolan presents a question of material fact for retaliation because she

took a protected action in discussing employment concerns with management. After the meeting in which this took place, TCC fired Nolan. The temporal proximity between Nolan's protected activity and her termination creates a reasonable inference that TCC took adverse action against her because of her complaint. This remains true, even if the docked pay resulted from a garnishment, because Nolan presents evidence of her belief in the docked pay resulting from her breaks. To sustain a retaliatory discharge claim, the employee need not establish that the retaliation resulted from reporting actual discrimination as long as the employee held a reasonable belief that the employer subjected someone to discrimination. *Bonidy v. Vail Valley Center for Aesthetic Dentistry, P.C.*, 232 P.3d 277, 281 (Colo. App. 2010); *Stebbings v. University of Chicago*, 312 Ill. App. 3d 360, 726 N.E.2d 1136, 1144, 244 Ill. Dec. 825 (2000).

## Wrongful Discharge

A claim of wrongful discharge in violation of public policy has four elements. *Billings v. Town of Steilacoom*, 2 Wn. App. 2d 1, 28, 408 P.3d 1123 (2017). The employee must prove: (1) the existence of a clear public policy, (2) discouraging the conduct in which they engaged would jeopardize the public policy, and (3) the public-policy-linked conduct caused their dismissal. *Billings v. Town of Steilacoom*, 2 Wn. App. 2d at 28-29. Additionally, (4) the defendant must not be able to offer an overriding justification for the employee's dismissal. *Billings v. Town of Steilacoom*, 2 Wn. App. 2d at 29.

Lisa Nolan identifies rest and meal breaks as a clear public policy as stated in a Washington regulation. We agree. Washington demands that employers afford employees rest and meal periods during the work day. WAC 296-126-092. Discouraging an employee's advocacy for rest and meal periods would harm the public policy. As with Nolan's retaliation claim, the close-in-time proximity between her protected activity and her termination creates a reasonable inference that the activity caused TCC to take adverse action against her.

## CONCLUSION

We reverse the trial court's grant of summary judgment to TCC on all three causes of action.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Lawrence-Berrey, J.

_____
Pennell, C.J.

22