**Richard C. SCHOPPERT, Plaintiff,**

v.

**CCTC INTERNATIONAL, INC., Respondent.**

**No. 96 C 8078.**

United States District Court, N.D. Illinois, Eastern Division.

Aug. 5, 1997.

James Andrew Romanyak, Gregory J. Schroedter, Bell, Boyd & Lloyd, Chicago, IL, for Plaintiff.

Charles Louis Glick, Margo Wolf O'Donnell, Hedlund, Hanley & John, Chicago, IL, for Respondent.

### MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

### RELEVANT FACTS

This case centers on claims by a salesman that he is due more commissions than his former employer has paid him, because the employer's unilateral attempts to change the terms of his employment were rejected by him. The employer insists that the employee did in fact accept the changes to his commission structure—by continuing to work after the changes were made—and has moved for summary judgment. The following facts are drawn from the statements submitted by the parties in compliance with Local General Rule 12.

Richard Schoppert was hired as a salesman by CCTC International, Inc. in January 1990. The terms of his employment were set out in a letter from CCTC to Schoppert, dated January 11, 1990: they included a $60,000 annual salary plus ½% commission on sales to certain assigned accounts.[1] The letter did not mention any fixed length of employment, and the parties agree that Schoppert's employment was "at will," that is, terminable at any time for any reason by either party. Schoppert indicated his acceptance of the terms of the offer by signing the letter in the space indicated on January 20, 1990, and returning it to CCTC. Schoppert then commenced work for CCTC.

In December 1991, CCTC informed Schoppert that it was changing his commission structure, so that instead of receiving a ½% commission on sales to assigned accounts, Schoppert would receive commissions on 2%

of the gross margin sales to assigned accounts (the "1991 Modification"). When told of this change at a meeting in Montreal, Schoppert testified that he told the CCTC executives that it was not acceptable. Their response was equally blunt: one of them said, "Well, that's the plan." One of the CCTC executives present at the meeting testified that Schoppert ultimately accepted the changes. Schoppert denies this. The 1991 Modification was implemented over Schoppert's objections, retroactive to September 1, 1991. Schoppert never received any written version of the 1991 Modification. Schoppert continued working for CCTC and was paid at the new, modified rate. Although Schoppert testified that he "continually objected" to the fact that he was being paid at this new rate, no evidence other than his own testimony in deposition supports this contention.

Two and a half years later in the summer of 1994, history repeated itself. Schoppert received two letters from CCTC in July, both announcing another unilateral revision to his contract that was to take effect August 1, 1994 (the "1994 Modification"). The revisions lowered Schoppert's base salary from $60,000 to $45,000, with a non-refundable advance on commissions of $15,000; raised the commission to approximately 6% of gross margins; required that he split sales responsibilities with another sales representative and "re-oriented his job responsibilities to the industrial market"; and required that he sign a non-compete agreement. The July 8, 1994 letter had a space for Schoppert's signature to indicate his assent, but Schoppert never signed it. A similar letter sent on July 15, 1994 also went unsigned. Nor did Schoppert ever sign the non-compete agreement. Although Schoppert did split his sales responsibilities and commissions with another sales representative, the parties dispute whether he did so under the 1994 Modification or under some other arrangement.

---

1. Both sides argue over whether certain accounts, such as the CSX account, were "assigned accounts" that belonged to Schoppert in perpetuity. This dispute is ultimately beside the point, as Schoppert apparently does not dispute that he has been paid in full all amounts due under the employment contracted as purportedly modified in 1991 and 1994. His sole dispute is whether those attempted modifications were legally effective: if not, he would be entitled to more money from CCTC.

Instead, Schoppert wrote CCTC a lengthy letter on July 19, 1994 explaining his objections to the proposed modifications. Part of this letter reads, "In Feb. 1992 my incentive program was changed without my consent. Nevertheless, I continued working very [diligently] for CCTC, believing in the long range potential of the company." Def.'s Rule 12(M) Ex. F.

Despite his complaints, Schoppert continued to work, and CCTC continued paying him at the same rate as before ($60,000 per year). In a letter dated February 20, 1995, CCTC once again outlined the 1994 Modification it wished to make, and stated that it considered the Modification to have been made, retroactive to July 15, 1994. CCTC explained that the amount it was paying Schoppert, $60,000 per year, represented the sum of his new $45,000–a–year salary and a $15,000 non-refundable advance on commissions, as provided in the 1994 Modification, rather than his old $60,000 base salary. The February 1995 letter again sought Schoppert's signature as an indication of acceptance of its terms; Schoppert again did not sign it. On March 24, 1995, Schoppert's paycheck began reflecting a yearly salary of $45,000 with a $15,000 advance on commissions.

Schoppert responded with a letter of his own on April 28, 1995. In it, he objected to the change in his paycheck, reiterated that he had never agreed to the 1994 Modification, and stated that he would not do so without certain changes, which he proposed. In the letter, Schoppert also reiterated that he had not accepted or consented to the 1991 Modification. These denials of acceptance or consent to the various changes made by CCTC were a regular feature of his correspondence with CCTC thereafter. Over the next several months, Schoppert and CCTC's Director of Marketing and Sales had informal discussions about the proposed 1994 Modification, but never came to any formal agreement.

CCTC's first formal response to Schoppert's April 1995 letter did not come until nine months later. In a letter dated January 29, 1996, CCTC again informed Schoppert that it was operating under the terms of the 1994 Modification. The letter required Schoppert to sign and return the letter as well as some other documents, or else CCTC would "understand that [he did] not wish to continue his employment and [was] resigning from [his] position." Pl.'s Rule 12(M) Statement, Ex. D–3. Although the parties exchanged another round of letters, Schoppert still would not sign. CCTC fired him on February 22, 1996. Schoppert then brought this lawsuit, claiming that he was owed the difference between his starting salary and commission rate, and the post–1991 and – 1994 Modifications rate that he received. Both parties moved for summary judgment in their own favor. We denied Schoppert's motion without further briefing, finding that he could not show the absence of genuine issues of fact that would entitle him to judgment as a matter of law. We now address CCTC's motion.

## LEGAL STANDARDS

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). The nonmovant must "make a showing sufficient to establish the existence of [the] element[s] essential to that party's case, and on which that party will bear the burden of proof at trial" in order to withstand a motion for summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In determining whether factual issues exist, the court views all the evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in favor of that party. *Wolf v. Buss*, 77 F.3d 914, 918 (7th Cir.1996). However, if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party there is no 'genuine' issue for trial." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## ANALYSIS

It is well-established in Illinois that employment without any definite term is em-

ployment at will, which is terminable by either party at any time for any reason. "When an employment agreement is terminable at will, it may be modified by the employer as a condition of its continuance." *Doyle v. Holy Cross Hosp.*, 224 Ill.Dec. 507, 510–11, 682 N.E.2d 68, 71–72 (Ill.App.Ct. 1st Dist.1997); *see also Swalley v. Addressograph–Multigraph Corp.*, 158 F.2d 51, 54 (7th Cir.1946). Because the continuation of an at-will relationship cannot be taken for granted, if one party proposes a change to the terms of the contract and the other party nonetheless continues to perform as usual, the modification to the contract is deemed to be effective. The continued performance is seen as both acceptance and consideration. *See Garber v. Harris Trust & Savings Bank*, 104 Ill.App.3d 675, 683–85, 60 Ill.Dec. 410, 416–17, 432 N.E.2d 1309, 1315–16 (1st Dist. 1982).

The outcome of CCTC's motion for summary judgment turns on whether Schoppert accepted, and CCTC gave adequate consideration for, the 1991 and 1994 Modifications. Although such an inquiry ordinarily involves issues of fact, in this case the parties largely agree on the factual record. They simply disagree on the correct legal principles applicable to those facts. In approaching this issue, we found it easiest to address the two Modifications separately.

*The 1991 Modification*

The essential facts applicable to this Modification can be summed up briefly. In 1991 CCTC held a meeting at which it announced that Schoppert's commission structure would be changed. Schoppert objected and was told that he had no option but to accept the change. Schoppert claims that he subsequently "objected" to the change verbally in discussions with CCTC management, specifically Luc LaMarche. LaMarche does not recall any such discussions. Despite these objections, and despite being paid less because of the new commission structure,

Schoppert continued to work for the following two and a half years.

■ We find that, on these facts, Schoppert must be deemed to have accepted the 1991 Modification. The Modification was "offered" at the December 1991 meeting, and we think it clear that the CCTC made it plain to Schoppert that the consideration for the Modification would be his continued employment with CCTC. Even crediting Schoppert's version that he "objected continually" to the Modification, as we must on a motion for summary judgment, his actions in continuing to work for over two and a half years, without any demonstration that CCTC might reconsider its ultimatum to him, belie those verbal objections. Schoppert has not indicated that he ever told anyone at CCTC that he would only work under the pre–1991 terms, or that his continued performance was in any way conditioned on the retention of his earlier commission structure. Nor is there any evidence that the 1991 Modification remained open to further negotiation after the December 1991 meeting. In these circumstances, Schoppert's continuing to work for over two and a half years while receiving commissions under the new structure must be seen in legal terms as an acceptance of the 1991 Modification, grudging and protest-filled as that acceptance may have been. The old saw "actions speak louder than words" has more than a grain of truth to it, and we adhere to it where, as here, a party's words are contradicted by his actions. In an at-will relationship where neither side is obligated to render future performance, continued performance by both parties serves as acceptance by one side and consideration by the other side. *See Garber v. Harris Trust & Sav. Bank*, 104 Ill.App.3d 675, 683–85, 60 Ill.Dec. 410, 416–17, 432 N.E.2d 1309, 1315–16 (1st Dist.1982).[2]

Schoppert argues that we should look only to his objections, not to his actions, in evaluating whether he accepted the 1991 Modification. In this, he relies heavily on *Bartinikas v. Clarklift of Chicago North, Inc.*, 508

---

**2.** In all of his letters to CCTC from July 19, 1994 and beyond, Schoppert declares that he never accepted the 1991 Modification. These post-hoc declarations are not good evidence of Schoppert's intent, as they are subject to revisions made in the light of hindsight. Rather, in seeking to determine Schoppert's intent we look to Schoppert's conduct at the time of the offer and over the next two and a half years as he routinely accepted each paycheck reflecting the lower commission rate.

F.Supp. 959 (N.D.Ill.1981). That case, like this one, involved a salesman who had been promised payment at one rate, but later was subjected to a demand from the company that he sign a new employment agreement that included a lower rate, as a condition of continued employment. The salesman refused to sign. Nevertheless, the company continued to employ him. Three months after the new employment contract had been tendered, the salesman handed in his resignation. His final pay was calculated under the new rate, not the old, and the salesman sued to recover the difference. *Id.* at 960. The court held that the salesman had not accepted the new, modified contract, because he had rejected it through both words and deed (refusing to sign it). The court also held that the employer "accepted" this rejection by continuing to employ the salesman. In stating its holding, however, the court employed sweeping language, stating that "in Illinois, an employer acting *ex parte*, without the consent of the employee, cannot modify the terms of the employment contract." *Id.* at 961. In support of this statement, the court cited *Sterba v. Blaser*, 33 Ill.App.3d 1, 337 N.E.2d 410 (1st Dist.1975), and *Simpson v. Norwesco, Inc.*, 583 F.2d 1007 (8th Cir.1978) (applying Illinois law).

■ Although we respect the opinions of our Chief Judge Aspen, we are reluctant to follow *Bartinikas* for several reasons. First, the cases it cites do not support the proposition that an employer in an at-will relationship cannot impose changes upon its employees as a condition of continued employment. *Sterba*, the first case cited, involves an employment relationship that was not at will. This difference from the present case (and *Bartinikas* ) is crucial. As noted by the Seventh Circuit in *Curtis 1000, Inc. v. Suess*, 24 F.3d 941 (7th Cir.1994), the continuation of the employment relation does *not* constitute consideration for a modification when the employment is not at will, because continued performance on both sides is already a term of the original contract. *See id.* at 946–47 (distinguishing *Robinson v. Ada S. McKinley*

*Community Servs. ., Inc.*, 19 F.3d 359 (7th Cir.1994) because it involved employment that was not at will).[3] By contrast, neither party to an at-will relationship has any obligation to perform in the future, and so doing so *can* provide valuable consideration for a modification of the contract. Because *Sterba* did not involve at-will employment, it is not applicable here.

Nor does *Simpson* provide strong support. It, too, relies on *Sterba*. The only other Illinois case *Simpson* cites for the proposition that an employer may not unilaterally change the terms of employment is *Cieslak v. Dahlstrom Mach. Works, Inc.*, 19 Ill.App.3d 995, 312 N.E.2d 654 (1st Dist.1974), a case on accord and satisfaction, of which only the abstract was published. Both of the cases cited by *Bartinikas* are weak support for its sweeping language.

But the real problem with Schoppert's reliance on *Bartinikas* is the difference in how the salesman there expressed his rejection. There, the employer tendered a new written employment contract requiring signature in order to accept it, and the salesman refused to sign it. It is hard to imagine a clearer rejection of an attempted modification than that. Here, by contrast, the only evidence suggesting any opposition to the 1991 Modification is Schoppert's own testimony, which refers vaguely to occasional verbal "objections" voiced to his supervisors. There is no evidence of the type of unequivocal rejection present in *Bartinikas*. Schoppert never told CCTC that he would not work under the new commission structure, or assert in any other genuine manner that he would not be bound by the Modification. Rather, Schoppert chose to stay for over two years while accepting commissions at the lower rate. Schoppert cannot accept the benefits of a contract modification and then, five years later, claim that the modification was not effective. All of the available evidence indicates that the 1991 Modification was a "done deal" following the December 1991 meeting, and that both parties recognized that fact, although

**3.** Several of the other cases relied upon by Schoppert are inapplicable for the same reason: they involve employment that is not at will. *See Robinson v. Ada S. McKinley Community Servs.,*

*Inc.*, 19 F.3d 359 (7th Cir.1994); *Todd v. Corporate Life Ins. Co.*, 945 F.2d 204 (7th Cir.1991); *Pankow v. WestAmerica Mortgage Co.*, 740 F.Supp. 1309 (N.D.Ill.1990).

Schoppert may have complained about it from time to time. On the facts presented by the parties, we easily conclude that no reasonable jury could find that Schoppert did not legally accept the 1991 Modification. We therefore grant summary judgment in favor of CCTC on that portion of Schoppert's claim that relates to the 1991 Modification.

*The 1994 Modification*

 The question of whether Schoppert can be said to have legally accepted the 1994 Modification is more complex, because the facts do not clearly indicate either acceptance or rejection. Because of this ambiguity, we find that Schoppert has raised questions of fact on the issue of acceptance that must be resolved by a jury.

CCTC first formally proposed the 1994 Modification in July, 1994, via letters that explained the proposed changes and sought Schoppert's signature as evidence of acceptance. Part of the proposed Modification was the requirement that Schoppert sign a non-compete agreement. The record is clear that Schoppert never signed any of the letters sent to him regarding the 1994 Modification, nor did he ever sign the non-compete agreement. Because both of these actions were required by CCTC under the 1994 Modification, CCTC should reasonably have interpreted Schoppert's refusal to take those actions as a rejection of the Modification.

Further evidence supports the possibility that CCTC itself viewed Schoppert as having rejected the 1994 Modification, and that Schoppert's continued employment was not conditioned on his immediate acceptance of the Modification. For instance, CCTC sent additional letters in February 1995 and January 1996 noting that Schoppert had not yet signed any of the required documents, and again requiring him to do so. Although the February 1995 letter stated that Schoppert's salary was being calculated on the basis of the 1994 changes, Schoppert's check did not reflect those changes until March 1995. Not until January 1996 did CCTC state in writing that it would fire Schoppert if he did not sign. Throughout the period between July 1994 and January 1996, Schoppert and CCTC supervisors continued to discuss alternate proposals and engage in negotiations. All of

these facts, which must be viewed in the light most favorable to Schoppert on a motion for summary judgment, raise a genuine issue as to the actual terms of the proposed modifications begun in 1994, and whether or not Schoppert can be said to have accepted them as a matter of law. We thus deny CCTC's motion for summary judgment to the extent that it relates to the 1994 Modification, and find that these issues must be considered by a jury.

### CONCLUSION

For the foregoing reasons, we grant in part and deny in part CCTC's motion for summary judgment in its favor. The motion is granted as to the 1991 Modification and denied as to the attempted modifications beginning in 1994.

A Final Pretrial Order, together with any motions *in limine*, shall be filed on or before August 15, 1997. A jury trial on the remaining issues in this case will commence on August 25, 1997 at 10:00 a.m.