KEVIN GEARY, Plaintiff-Appellant, v. TELULAR CORPORATION, Defendant-Appellee.

First District (4th Division)    No. 1—02—0951

Opinion filed June 26, 2003.—Rehearing denied July 28, 2003.

Galliani, Doell & Cozzi, Ltd., of Chicago (Thomas J. Doell, of counsel), for appellant.

Much, Shelist, Freed, Denenberg, Ament & Rubenstein, P.C., of Chicago (Dawn M. Cassie, of counsel), for appellee.

JUSTICE HARTMAN delivered the opinion of the court:

Plaintiff Kevin Geary brought a declaratory judgment action against his former employer, defendant Telular Corporation. Count I alleged that defendant breached an agreement to pay plaintiff commissions by modifying plaintiff's commission plan. Count II alleged that defendant breached the modified commission plan. In count III, plaintiff alleged retaliatory discharge claiming that defendant terminated him because he asserted his rights under, *inter alia*, the Illinois Wage Payment and Collections Act (the Act) (820 ILCS 115/1 *et seq.* (West 2000)). Count IV, which named Motorola, Inc. (Motorola), as a respondent in discovery, was nonsuited on August 5, 1999.

Plaintiff was employed as a regional sales manager by defendant in October 1993. Plaintiff signed an employment agreement on May 3, 1994, which stated that his employment was at will. In March 1995, plaintiff was assigned to the "Motorola Account Team." In March 1995 plaintiff was informed that his commissions were to be "paid on a monthly basis for product *shipped* to Motorola at a rate of .3% based on revenue generated." (Emphasis in original.) On September 6, 1995, plaintiff's compensation plan provided for monthly commissions equal to .5% "of all Motorola revenues generated by the Motorola Account Team."

The Motorola Account Team, including plaintiff, was working to have defendant selected as Motorola's supplier of fixed wireless terminals (FWTs) to Motorola's customer in Hungary. This was referred to as the Motorola-Hungary project. On September 29, 1995, Motorola awarded defendant the contract for the supply of FWTs for Motorola-Hungary. The award stated that it was contingent on defendant's ability to do certain things. John Schoen, a Motorola executive, testified by deposition that the September 29, 1995, document was an offer of an award to which a counteroffer was made by defendant. He further stated that negotiations continued between the parties until March 7, 1996, when the parties entered into a purchase order.

Defendant underwent a reorganization in late 1995 and early 1996. All members of the Motorola Account Team except for plaintiff were terminated. On February 29, 1996, as part of the reorganization, plaintiff was promoted to the position of director of business development-Motorola. On April 12, 1996, defendant informed plaintiff that his compensation plan in the new position would consist of a base salary of $65,000 and a quarterly commission based on a percentage of

a target plan rather than a percentage of revenues generated. Plaintiff verbally objected to the change.[1] Plaintiff received payments of $6,000 each in July and November 1996 under the new plan.

Kenneth E. Millard, president of defendant, testified by deposition that when the April 1996 plan was introduced, plaintiff was told that he would not get commissions based on the old plan. Everyone, including plaintiff, had been paid commissions earned up until that point and was then put on the new plan going forward. Millard explained that as part of the April 1996 plan, plaintiff was given a guaranteed minimum commission of $6,000 for the first few quarters in recognition of his prior work on the Motorola account. Plaintiff was the only employee given the guaranteed minimum commission.

Plaintiff was fired on February 12, 1997.

Defendant successfully moved for summary judgment on counts I and III.[2] Plaintiff unsuccessfully moved for reconsideration with regard to count I. Plaintiff appeals both the grant of summary judgment on counts I and III and the denial of his motion to reconsider with regard to count I.

■ Summary judgment will be granted when the pleadings, depositions, exhibits, and affidavits on file reveal no genuine issue as to any material fact and establish that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2—1005 (West 2000); *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 607 N.E.2d 1204 (1992) (*Outboard Marine*). All evidence must be construed in the light most favorable to the nonmoving party and most strictly against the moving party. *Gatlin v. Ruder*, 137 Ill. 2d 284, 560 N.E.2d 586 (1990). Appellate review of orders granting summary judgment is *de novo* (*Outboard Marine*, 154 Ill. 2d at 102), and such an order will be reversed only if a material issue of fact is found to exist. *Finn v. Dominick's Finer Foods, Inc.*, 244 Ill. App. 3d 278, 614 N.E.2d 358 (1993).

# I

Plaintiff first contends that the circuit court erred in granting

---

[1]Plaintiff points to an undated memo from his boss Ray O'Leary proposing a solution to the Motorola-Hungary commission issue as evidence of his continued objections to the April 1996 plan. This memo is contained only in the appendix to plaintiff's brief and is not part of the record on appeal. Therefore, it cannot be considered by this court. *Jenkins v. Wu*, 102 Ill. 2d 468, 468 N.E.2d 1162 (1984).

[2]The circuit court denied defendant's request for summary judgment on count II. Following a jury trial on count II, judgment was entered in favor of plaintiff and against defendant in the amount of $25,000. That judgment has been fully paid and is not part of this appeal.

summary judgment in favor of defendant on count I. Defendant responds that summary judgment properly was granted because plaintiff, an at-will employee, accepted the modified compensation plan when he continued to work and receive commissions under the April 1996 plan.

■ When an employment agreement is terminable at will, it may be modified by the employer as a condition of its continuance. *Ohlemeier v. Community Consolidated School District No. 90*, 151 Ill. App. 3d 710, 502 N.E.2d 1312 (1987); *Wyatt v. Dishong*, 127 Ill. App. 3d 716, 469 N.E.2d 608 (1984) (*Wyatt*); *Garber v. Harris Trust & Savings Bank*, 104 Ill. App. 3d 675, 432 N.E.2d 1309 (1982). This right to modify unilaterally at-will employment terms applies to modifying compensation terms. *Wyatt*, 127 Ill. App. 3d at 720. When an at-will employee continues to work after a change in commission plan, he is deemed to have accepted the change. *Schoppert v. CCTC International, Inc.*, 972 F. Supp. 444 (N.D. Ill. 1997) (*Schoppert*).

In *Schoppert*, plaintiff, an at-will employee, alleged that his employer unilaterally modified his compensation plan once in 1991 and again in 1994. With regard to the 1991 modification, the employer held a meeting and announced that the commission structure would change. Plaintiff objected and was told that was the plan. Despite subsequent verbal objections, plaintiff continued to work after the change in commission structure. The court found that plaintiff's "continuing to work over two and one half years while receiving commissions under the new structure must be seen in legal terms as an acceptance of the 1991 modification, grudging and protest-filled as that acceptance may have been." *Schoppert*, 972 F. Supp. at 447.

Plaintiff argues that the present case is more akin to the second modification (1994 modification) in *Schoppert*, on which summary judgment was not granted. The court found a question of fact regarding plaintiff's acceptance of the 1994 modification where it was proposed via letters which sought plaintiff's signature as evidence of acceptance and plaintiff never signed the letters. Moreover, even though the 1994 modification was proposed in July 1994, the employer continued to operate under the former plan until March 1995 and continued to negotiate with plaintiff until January 1996. Such facts simply are not present in the case at bar.

It is undisputed that plaintiff was an at-will employee. It is further undisputed that plaintiff continued to work for defendant for nine months after the April 1996 modification to his commission plan. Moreover, plaintiff accepted commissions paid under the new plan.

Plaintiff does not dispute defendant's right to make prospective changes to plaintiff's compensation plan. Rather, plaintiff argues that

when defendant unilaterally changed plaintiff's compensation plan in April 1996, the commissions on the Motorola-Hungary project already were earned. Plaintiff concedes that pursuant to all the compensation plans, the commissions were payable when the product shipped as long as he was employed by defendant, but he argues that they were earned when the buyer "agreed to purchase," here September 29, 1995, when Motorola awarded defendant the contract to supply FWTs for the Motorola-Hungary project. Plaintiff claims, therefore, that he was entitled to commissions for any product that shipped to Motorola-Hungary between September 29, 1995, and February 12, 1997, when he was terminated.

The record establishes that the sale was not complete on September 29, 1995. The September 29, 1995, award indicated that it was contingent on defendant's ability to do several things. John Schoen, a Motorola executive, testified by deposition that the September 29 document was not a contract, but an offer of an award to which defendant presented a counteroffer. He further stated that negotiations continued between defendant and Motorola from September 29, 1995, until at least March 7, 1996, when Motorola presented an initial purchase order.

Defendant responds that plaintiff's commissions were not tied to the completion of sales discussions or to a commitment to purchase. Rather, per the written compensation plans, commissions were not earned until the product was shipped. The March 1995 plan stated that commissions would be "paid on a monthly basis for product *shipped* to Motorola at a rate of .3% based on revenue generated." (Emphasis in original.) The September 6, 1995, plan increased the rate to .5%. Millard, president of defendant, testified by deposition that sales meant product shipped. If product did not ship, an employee was not entitled to any commission.

In support of his position regarding when commissions were earned, plaintiff presents only his affidavit, which states "that my understanding of [defendant's] use of the term 'revenue generated' is that it means the agreement or commitment by Motorola to purchase FWTs from [defendant]." Plaintiff further averred "that in practice, commissions were earned upon customer commitment and paid upon shipment." Affidavits offered in opposition to a motion for summary judgment must not contain conclusions, but evidentiary facts to which the affiant is capable of testifying. *Webber v. Armstrong World Industries, Inc.*, 235 Ill. App. 3d 790, 601 N.E.2d 286 (1992). Unsupported assertions, opinions, and self-serving or conclusory statements do not comply with Supreme Court Rule 191(a) (145 Ill. 2d R. 191(a)). *Jones v. Dettro*, 308 Ill. App. 3d 494, 720 N.E.2d 343 (1999).

There is no issue of fact that commissions were earned when product shipped. The question then is whether or not any product shipped to Motorola prior to the April 1996 change in plaintiff's commission plan. Plaintiff cites the Seventh Circuit's statement in the fact section of its opinion in *Houben v. Telular Corp.*, 231 F.3d 1066, 1070 (7th Cir. 2000)[3] (*Houben*), that defendant "eventually shipped $8.586 million of product to Motorola in 1996 and $21.190 million in 1997." *Houben* does not specify when in 1996 shipments were made. Moreover, plaintiff admits in his response to defendant's motion for summary judgment that product shipped incident to the Motorola-Hungary project from May 1996 through the middle of 1997.

■ Because no product had shipped prior to the April 1996 change in plaintiff's compensation plan, no commission on the Motorola-Hungary account had been earned under the old plan when the plan changed. Millard testified by deposition that, when the new plan was introduced everyone, including plaintiff, was paid for any commissions that had been earned up until that point and was then put on the new plan going forward. He further stated that plaintiff was given a guaranteed minimum commission of $6,000 per quarter for the first few quarters under the new plan in recognition for his prior work on the Motorola account. It is undisputed that plaintiff accepted these guaranteed minimum commission payments.

Defendant had the right to change unilaterally plaintiff's compensation plan because plaintiff was an employee at will. Plaintiff accepted the April 1996 modifications to the compensation plan when he accepted payment of commissions under the April 1996 plan and continued employment. See *Schoppert*, 972 F. Supp. at 447. The circuit court did not err in granting summary judgment in favor of defendant on count I.

## II

Plaintiff next contends that the circuit court erred in granting summary judgment in favor of defendant on count III, which alleged retaliatory discharge as a result of plaintiff's alleged demands for payment of commissions under the Act.

■ ■ The tort of retaliatory discharge is a limited and narrow exception to the general rule that an at-will employee is terminable at any time for any or no cause. *Paris v. Cherry Payment Systems, Inc.*, 265 Ill. App. 3d 383, 638 N.E.2d 351 (1994) (*Paris*). A valid claim for retaliatory discharge requires a showing that an employee has been

---

[3]*Houben* involved the claims of Susan Cooper Houben, the original head of the Motorola-Hungary account team who was fired during the reorganization, for commissions she claimed she earned while working for defendant.

(1) discharged; (2) in retaliation for the employee's activities; and (3) that the discharge violates a clearly mandated public policy. *Paris*, 265 Ill. App. 3d at 385. Illinois courts have applied the tort of retaliatory discharge in only two situations: (1) where the discharge stems from asserting a worker's compensation claim (*Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172, 384 N.E.2d 353 (1978)) and (2) where the discharge is for certain activities referred to as "whistle-blowing" (*Palmateer v. International Harvester Co.*, 85 Ill. 2d 124, 421 N.E.2d 876 (1981) (*Palmateer*)). *Jacobson v. Knepper & Moga, P.C.*, 185 Ill. 2d 372, 706 N.E.2d 491 (1998). Other than these two circumstances, however, Illinois courts consistently have refused to expand the tort to encompass a private and individual grievance. See *Price v. Carmack Datsun, Inc.*, 109 Ill. 2d 65, 485 N.E.2d 359 (1985); *McGrath v. CCC Information Services, Inc.*, 314 Ill. App. 3d 431, 731 N.E.2d 384 (2000) (*McGrath*); *Eisenbach v. Esformes*, 221 Ill. App. 3d 440, 582 N.E.2d 196 (1991); *Abrams v. Echlin Corp.*, 174 Ill. App. 3d 434, 528 N.E.2d 429 (1988) (*Abrams*). The supreme court repeatedly has emphasized the goal of restricting the tort of retaliatory discharge. See *Fisher v. Lexington Health Care, Inc.*, 188 Ill. 2d 455, 467, 722 N.E.2d 1115 (1999) (*Fisher*) (noting that the court "has consistently sought to restrict the common law tort of retaliatory discharge"); *Zimmerman v. Buchheit of Sparta, Inc.*, 164 Ill. 2d 29, 37-38, 645 N.E.2d 877 (1994) (*Zimmerman*) (noting that the supreme court has "expressed its disinclination to expand the tort of retaliatory discharge"). There is no precise definition of what constitutes a clearly mandated public policy. In general, public policy concerns what is right and just and what affects the citizens of the state collectively. *Palmateer*, 85 Ill. 2d at 130. Merely citing a constitutional or statutory provision in a complaint will not give rise to a retaliatory discharge cause of action. *McGrath*, 314 Ill. App. 3d at 440. In order to constitute a clearly mandated public policy exception justifying application of the tort of retaliatory discharge, the matter "must strike at the heart of a citizen's social rights, duties, and responsibilities." *Palmateer*, 85 Ill. 2d at 130.

Illinois courts have on several occasions refused to expand the tort of retaliatory discharge to claims under the Act, finding that a discharge allegedly in retaliation for complaints about unpaid wages under the Act does not violate a clearly mandated public policy. *McGrath*, 314 Ill. App. 3d at 440-41; *Abrams*, 174 Ill. App. 3d at 440, 442. In *McGrath*, the court noted that the policy concerns underlying the Act are economic. The dispute over plaintiff's conditional stock options and calculation of a bonus was economic in nature and did not "strike at the heart" of plaintiff's social rights, duties, and responsibilities. Plaintiff's claim was more in the nature of a private and

individual grievance insufficient to justify a claim of retaliatory discharge.

Plaintiff admits in his brief that if *McGrath* is followed, summary judgment properly was granted in favor of defendant. Plaintiff argues, however, that the facts of this case support an exception to the *McGrath* rule. According to plaintiff, the evidence in this case, combined with the facts of *Houben*, raises a genuine issue of material fact regarding the existence of a pattern of behavior by defendant of wrongfully terminating employees once they had produced the desired results, but prior to paying them commissions. Such behavior, plaintiff argues, would strike sufficiently at "the heart of the citizen's social rights, duties, and responsibilities" to make the actions of defendant a violation of a clearly mandated public policy.

■ The record is devoid of any evidence of such a pattern of behavior. Moreover, plaintiff did not plead such a pattern of behavior in his complaint. The supreme court's stated reluctance to expand the tort of retaliatory discharge militates against creating such an exception to the *McGrath* rule. See *Fisher*, 188 Ill. 2d at 467; *Zimmerman*, 164 Ill. 2d at 37-38.

In granting summary judgment, the circuit court stated "case law holds that it is against the public policy of Illinois to discharge an employee for asserting his right to wages due under the [Act]. However, there is no persuasive evidence before the court that plaintiff was discharged in retaliation for asserting his rights to alleged commission due to him." As discussed above, Illinois law ineluctably holds that a discharge allegedly in retaliation for complaints of unpaid wages under the Act does not violate a "clearly mandated public policy." The appellate court may affirm the grant of summary judgment for any reason that appears in the record, regardless of whether that reason is the reason relied upon by the circuit court. *Leavitt v. Farwell Tower Ltd. Partnership*, 252 Ill. App. 3d 260, 625 N.E.2d 48 (1993). Because there is no genuine issue of material fact regarding whether plaintiff's discharge violated a "clearly mandated public policy," summary judgment properly was granted in favor of defendant.

Accordingly, for the reasons set forth above, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

THEIS, P.J., and KARNEZIS, J., concur.