# Illinois Official Reports

## Appellate Court

---

**Roberts v. Board of Trustees Community College District No. 508,**
**2018 IL App (1st) 170067**

---

| | |
|---|---|
| Appellate Court Caption | KENRICK ROBERTS, Plaintiff-Appellant, v. BOARD OF TRUSTEES COMMUNITY COLLEGE DISTRICT NO. 508, d/b/a City Colleges of Chicago, Defendant-Appellee. |
| District & No. | First District, First Division<br>Docket No. 1-17-0067 |
| Filed | April 16, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 15-L-9430; the Hon. James Snyder, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part.<br>Cause remanded. |
| Counsel on Appeal | Holman & Stefanowicz, LLC, of Chicago (Brian R. Holman, Dennis H. Stefanowicz Jr., and Tara Beth Wenz, of counsel), for appellant.<br><br>Jackson Lewis P.C., of Chicago (James P. Daley, David M. Novak, and James D. Thomas, of counsel), for appellee. |

| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion. Presiding Justice Pierce and Justice Mikva concurred in the judgment and opinion. |
|---|---|

## OPINION

¶ 1 Plaintiff-appellant, Kenrick Roberts, filed this action against defendant-appellee, Board of Trustees Community College District No. 508 d/b/a City Colleges of Chicago, alleging causes of action for common law retaliatory discharge, violations of the Whistleblower Act (740 ILCS 174/20 (West 2016)), and wrongful termination. After engaging in motion practice, the circuit court dismissed the retaliatory discharge claim and whistleblower claim with prejudice.

¶ 2 On appeal, plaintiff contends the circuit court erred in dismissing those two counts. He contends his claim for retaliatory discharge successfully alleges a violation of Illinois public policy. He also claims the second amended complaint properly alleges he refused to participate in defendant's unlawful conduct so as to fall within the protection of the Whistleblower Act.

¶ 3 For the reasons stated more fully below, we reverse the dismissal of plaintiff's retaliatory discharge claim but affirm the dismissal of his claim brought under the Whistleblower Act.

¶ 4                                          JURISDICTION

¶ 5 On October 25, 2016, the circuit court dismissed with prejudice count I (retaliatory discharge) and count II (Whistleblower Act) of plaintiff's second amended complaint. According to the record, plaintiff made an oral motion for Illinois Supreme Court Rule 304(a) language, which the circuit court denied. Ill. S. Ct. R. 304(a) (eff. Mar. 8, 2016). On November 22, 2016, the plaintiff filed a motion to reconsider the denial of Rule 304(a) language. On December 15, 2016, the circuit court granted the motion to reconsider. In granting the motion, the circuit court made an express finding under Rule 304(a) that there was no just reason to delay the appeal of the October 25 dismissal of counts I and II. Plaintiff filed his notice of appeal on January 5, 2017. Accordingly, this court has jurisdiction over this matter pursuant to article VI, section 6 of the Illinois Constitution and Illinois Supreme Court Rules 301 and 304(a). Ill. Const. 1970, art. VI, § 6; Ill. S. Ct. R. 301 (eff. Feb. 1, 1994); R. 304(a) (eff. Mar. 8, 2016).

¶ 6                                          BACKGROUND

¶ 7 In March 2013, plaintiff began working for the defendant as the clinical coordinator of the physician assistant program at Malcolm X College (Malcolm X). In June 2014, plaintiff was promoted to the position of program director of the physician assistant program.[1] In November 2014, plaintiff was promoted to the position of director of medical programs.

¶ 8 As the director of medical programs, plaintiff reported directly to and worked closely with Dr. Micah Young, the dean of health sciences and career programs at Malcolm X and Dr. Mario De La Haye, the associate dean of health sciences and career programs at Malcolm X.

---

[1]Malcolm X College is a community college located in the City of Chicago and is operated by defendant.

As part of his job duties and responsibilities as the director of medical programs, plaintiff was responsible for vetting potential instructors for teaching various courses and curriculum. This responsibility included ensuring instructors assigned to teach various courses, including but not limited to HeaPro 101, met the appropriate accreditation standards and had the correct qualifications to teach the assigned course and curriculum.

¶ 9    HeaPro 101 includes the instruction of phlebotomy[2] and electrocardiograms (EKG). The National Accrediting Agency for Clinical Laboratory Sciences (NAACLS) states that in order for a course or curriculum to be accredited and approved for phlebotomy, the class must have qualified faculty. Under NAACLS, in order to be qualified to teach phlebotomy within the phlebotomy or health care basic certificate program, the faculty needs to be a certified professional in that field, must demonstrate knowledge and proficiency in that field, and must demonstrate the ability to teach effectively at the appropriate level. A professor can be certified in phlebotomy by the National Phlebotomy Association or through the American Society of Clinical Pathologists.

¶ 10    On or about January 15, 2015, plaintiff alleges that he became aware of complaints that the instructor assigned to teach HeaPro 101 was unqualified to teach the course and curriculum. As a result of the complaints, plaintiff met with the HeaPro 101 instructor and questioned her qualifications to teach HeaPro 101. The instructor informed plaintiff that she had never taught phlebotomy before, she was unfamiliar with the requirements and certifications necessary to become a phlebotomist, phlebotomy was not her area of expertise, and she did not have any certifications in phlebotomy. After meeting with the instructor, plaintiff found her unqualified to teach HeaPro 101.

¶ 11    On or about January 15, 2015, plaintiff sent an e-mail to Dr. Young and Dr. De La Haye complaining about the unqualified instructor. The e-mail stated:

"In compliance with the City Colleges of Chicago policy and the College of Health Science credentialing standards and requirements it is my responsibility as Program Director of HeaPro 101 to review, evaluate and approve the recommendation of each faculty member that is approved to teach in the program which I am director. Taking into consideration I had no input into the department decision to appoint a nurse to teach HeaPro 101 without my review of the credentials and necessary certifications and licenses put our programs and students at risk. Please note this is a breach of the standards that were developed to ensure that the students obtain the best outcomes moving forward with their education in the medical field. Please note I am very concerned about the direction in which we are traveling and wish to address this matter."

After receiving the e-mail from plaintiff, Dr. Young sent an e-mail to the president and provost of Malcolm X stating his concerns about the unqualified instructor and asked how it should be addressed.

¶ 12    Following his January 15, 2015, e-mail, plaintiff made verbal complaints to Dr. Anthony Munroe, president of Malcolm X, regarding the appointment of an unqualified professor to teach HeaPro 101. He informed Dr. Munroe that he had been intentionally excluded from the hiring process of the unqualified instructor and he refused to support the assignment. On February 4, 2015, without prior notice, Dr. Young was unexpectedly terminated from his

---

[2]Phlebotomy is the practice of drawing blood from a patient for clinical testing.

position with defendant. On February 5, 2015, Dr. De La Haye was unexpectedly placed on paid administrative leave. Dr. De La Haye remained on leave until his termination on April 20, 2015.

¶ 13    On February 25, 2015, plaintiff sent an e-mail to the president, vice president, and associate provost again complaining about the unqualified instructor assigned to teach HeaPro 101. In addition to what plaintiff had previously learned from his interview with the instructor, plaintiff had learned that the instructor had abandoned the class. Plaintiff found out another individual was assigned to complete instruction in the course, but this individual was not properly certified to teach EKG.

¶ 14    Upon receipt of plaintiff's February 25, 2015, e-mail, Dr. Christopher Robinson-Easley, vice president of Malcolm X, requested that plaintiff meet with her regarding the complaints in the e-mail. After receiving the request from Dr. Robinson-Easley, plaintiff sent an e-mail to Aaron Allen, executive director of labor and employee relations. Plaintiff told Allen that he felt uncomfortable about Dr. Robinson-Easley's request considering his complaints regarding the instructor. Dr. Robinson-Easley was the individual who selected and assigned the unqualified instructor to HeaPro 101. At the meeting, plaintiff found Dr. Robinson-Easley upset about his complaints and unwilling to address his concerns.

¶ 15    Plaintiff continued to complain and question the appointment of the unqualified instructor and the college's failure to address the situation to Dr. Munroe. Following the meeting with Dr. Robinson-Easley, plaintiff was excluded from important meetings, decisions, and discussions regarding programs that were under his responsibilities as director of medical programs.

¶ 16    On June 15, 2015, Roy Walker, the associate dean of health sciences and career programs at Malcolm X, informed plaintiff that Dr. Robinson-Easley "has an axe to grind with you" because of the HeaPro 101 complaints. On June 28, 2015, Dr. Munroe instructed plaintiff to file an equal employment opportunity complaint against Dr. Robinson-Easley for retaliation in connection with plaintiff's complaints. On August 7, 2015, plaintiff was advised that he was terminated from his position as director of medical programs at Malcolm X.

¶ 17    Plaintiff filed his original complaint on September 15, 2015. Plaintiff brought three causes of action: retaliatory discharge, violation of the Whistleblower Act, and wrongful termination. Defendant brought a motion to dismiss pursuant to section 2-619.1 of the Code of Civil Procedure (Code). 735 ILCS 5/2-619.1 (West 2016). The circuit court granted the motion with respect to the retaliatory discharge claim and whistleblower claim but granted plaintiff an opportunity to replead. On February 24, 2016, plaintiff filed his amended complaint containing the same three counts. Defendant filed another section 2-619.1 motion to dismiss, and the circuit court dismissed the same two counts, again with leave to replead.

¶ 18    A second amended complaint alleging the same causes of action as the prior complaints was filed on June 27, 2016. This time defendant moved to dismiss the retaliatory discharge claim and whistleblower claim pursuant to section 2-615(a) of the Code. *Id.* § 2-615(a). On October 25, 2016, the circuit court granted the motion with prejudice. At the time, plaintiff made an oral motion for the inclusion of Rule 304(a) language, but this request was denied. Plaintiff moved to reconsider the denial of Rule 304(a) language, and on December 15, 2016, the circuit court granted plaintiff's motion to reconsider. The circuit court then entered an order finding no just reason to delay the appeal. Plaintiff timely filed a notice of appeal. The wrongful termination claim remains pending before the circuit court and is not before us.

¶ 20       On appeal, plaintiff argues that the circuit court erred in dismissing his common law retaliatory discharge claim and his whistleblower claim. Both counts are before us after being dismissed pursuant to section 2-615(a) of the Code. *Id.*

¶ 21       A motion brought pursuant to section 2-615 tests the legal sufficiency of the complaint based on defects apparent on its face. *Doe-3 v. McLean County Unit District No. 5 Board of Directors*, 2012 IL 112479, ¶ 15. A section 2-615 motion presents the question of whether the facts alleged in the complaint, viewed in a light most favorable to the plaintiff and taking all well-pleaded facts and all reasonable inferences that may be drawn from those facts as true, are sufficient to state a cause of action upon which relief can be granted. *Id.* ¶ 16. "[A] cause of action should not be dismissed pursuant to section 2-615 unless it is clearly apparent that no set of facts can be proved that would entitle the plaintiff to recovery." *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 429 (2006). In ruling on a section 2-615 motion, the court considers only (1) those facts apparent on the face of the pleadings, (2) matters subject to judicial notice, and (3) judicial admissions in the record. *Gillen v. State Farm Mutual Automobile Insurance Co.*, 215 Ill. 2d 381, 385 (2005). We review the grant of a section 2-615 motion *de novo*. *Doe-3*, 2012 IL 112479, ¶ 15. Under this standard of review, we are not bound by the circuit court's reasoning or decision. See *State Automobile Mutual Insurance Co. v. Habitat Construction Co.*, 377 Ill. App. 3d 281, 291 (2007).

¶ 22       Illinois follows the at-will employment rule, which means "a noncontracted employee is one who serves at the employer's will, and the employer may discharge such an employee for any reason or no reason." *Zimmerman v. Buchheit of Sparta, Inc.*, 164 Ill. 2d 29, 32 (1994). Illinois recognizes an exception to the general at-will employment rule when the discharge violates a clear mandate of public policy. *Turner v. Memorial Medical Center*, 233 Ill. 2d 494, 501 (2009). This exception to the general rule acknowledges that under the common law "parties to a contract may not incorporate in it rights and obligations which are clearly injurious to the public." *Palmateer v. International Harvester Co.*, 85 Ill. 2d 124, 129 (1981). This exception represents the common law cause of action known as retaliatory discharge. *Fellhauer v. City of Geneva*, 142 Ill. 2d 495, 505 (1991).

¶ 23       In order to state a cause of action for retaliatory discharge, an employee must allege (1) the employer discharged the employee, (2) in retaliation for the employee's activities, and (3) the discharge violates a clear mandate of public policy. *Id.* The Illinois Supreme Court has continuously cautioned the tort of retaliatory discharge is narrow in scope and the at-will employment rule remains the law of Illinois. *Turner*, 233 Ill. 2d at 501. This tort seeks to achieve "a proper balance *** among the employer's interest in operating a business efficiently and profitably, the employee's interest in earning a livelihood, and society's interest in seeing its public policies carried out." *Palmateer*, 85 Ill. 2d at 129.

¶ 24       Before this court, the only issue concerning plaintiff's retaliatory discharge claim is whether it states a violation of a clear mandate of Illinois public policy. The existence and ascertainment of public policy is a question for the court to decide. *Turner*, 233 Ill. 2d at 501-02. In *Palmateer*, the Illinois Supreme Court discussed the meaning of "clearly mandated public policy":

> "There is no precise definition of the term. In general, it can be said that public policy concerns what is right and just and what affects the citizens of the State collectively. It is to be found in the State's constitution and statutes and, when they are

silent, in its judicial decisions. [Citation.] Although there is no precise line of demarcation dividing matters that are the subject of public policies from matters purely personal, a survey of cases in other States involving retaliatory discharges shows that a matter must strike at the heart of a citizen's social rights, duties, and responsibilities before the tort will be allowed." *Palmateer*, 85 Ill. 2d at 130.

Our court recognizes the tort is meant to prevent employers from "effectively frustrat[ing] a significant public policy by using its power of dismissal in a coercive manner." *Fellhauer*, 142 Ill. 2d at 508. The purpose of the tort is "to deter employer conduct inconsistent with [the public] policy." *Id.* Because the tort is concerned with the protection and enforcement of public policy, a complaining party "must only show that the conduct complained of contravenes a clearly mandated public policy, not necessarily a law." *Stebbings v. University of Chicago*, 312 Ill. App. 3d 360, 369 (2000).

¶ 25 In the case before us, plaintiff's position at Malcolm X required him to ensure instructors in classes like HeaPro 101 were qualified to teach the course and curriculum. Plaintiff alleges that despite his position and responsibilities, Dr. Robinson-Easley appointed unqualified individuals to teach HeaPro 101 without consulting with plaintiff. After a meeting with the phlebotomy instructor of HeaPro 101, plaintiff learned she had never taught phlebotomy, was unfamiliar with the requirements and certifications necessary to become a phlebotomist, phlebotomy was not her area of expertise, and she did not have any certifications in phlebotomy. Plaintiff concluded the instructor was unqualified to teach HeaPro 101.

¶ 26 In an e-mail to several higher ranking school officials, including Dr. Robinson-Easley, plaintiff expressed concern the appointments jeopardized the enrolled students' ability to obtain the educational benefits HeaPro 101 was designed to provide. When this instructor abandoned HeaPro 101, another unqualified instructor was put in place. This new instructor was also unqualified and not properly certified in EKG.

¶ 27 When plaintiff complained about the assignment of the unqualified instructors, he was terminated. Plaintiff then brought this suit containing a claim for retaliatory discharge. Plaintiff alleges his discharge for complaining about the unqualified instructors violated a specific public policy: "the right to obtain the benefits of a post-secondary education through federal and state funded programs."

¶ 28 In support of his argument, plaintiff cites to Title IV of the Higher Education Act of 1965 (20 U.S.C §§ 1070-1099d (2012)), which establishes various loan and grant programs to assist students in obtaining a postsecondary education at places like Malcolm X. The funds must be used at eligible institutions. In order to be an eligible institution, defendant must sign and comply with a program participation agreement (PPA). The PPA requires defendant to "meet the requirements established by *** accrediting agencies or associations" (*id.* § 1094(a)(21)) and provide accurate information to these accrediting agencies. Plaintiff's complaint alleges defendant breached the PPA when it asserted to the accrediting agencies that HeaPro 101 instructors were properly qualified. Plaintiff also cites to section 1094(c)(3)(A), which subjects any eligible institution to suspension or termination if it has engaged "in substantial misrepresentation of the nature of its educational program, its financial charges, or the employability of its graduates." *Id.* § 1094(c)(3)(A).

¶ 29 While not cited to by the plaintiff, we take judicial notice of the Higher Education Loan Act (Act) (110 ILCS 945/0.01 *et seq.* (West 2016)). See *Cruz v. Puerto Rican Society*, 154 Ill.

App. 3d 72, 75 (1987) (reviewing courts may take judicial notice of statutes of this state). Section 2 ("Declaration of Purpose") of the Act states:

> "It is declared that for the benefit of the people of the State of Illinois, the conduct and increase of their commerce, the protection and enhancement of their welfare, the development of continued prosperity and the improvement of their health and living conditions, *it is essential that this and future generations of youth be given the fullest opportunity to learn and to develop their intellectual and mental capacities and skills*; that to achieve these ends it is of the utmost importance that students attending institutions of higher education located in Illinois have reasonable alternatives to enhance their financial access to such institutions; *that reasonable financial access to institutions of higher education will assist such youth in achieving the required levels of learning and development of their intellectual and mental capacities and skills*; that it is the purpose of this Act to provide a measure of assistance and an alternative method to enable students and the families of students attending institutions of higher education located in Illinois to appropriately and prudently finance the cost or a portion of the cost of such higher education; and that it is the intent of this Act to supplement federal guaranteed higher education loan programs, other student loan programs, and grant or scholarship programs to provide the needed additional options for the financing of a student's higher education in execution of the public policy set forth above." (Emphases added.) 110 ILCS 945/2 (West 2016).

Our General Assembly has concluded the purpose of providing public funds for higher education is to provide the fullest opportunity for recipients to learn and develop their "intellectual and mental capacities and skills." *Id.* Based on the above, it is obvious to this court the purpose of establishing both state and federal loan programs is to ensure individuals without the private means of paying for a college education are given access to funds to better develop themselves intellectually so as to provide a greater contribution to our state and country.

¶ 30   This is a case of first impression in this State. While the tort of retaliatory discharge is well established in our jurisprudence, none of the cases cited by the parties or uncovered in the court's own research shows this claim has been brought in the circumstances presented in this matter. Courts in this state have limited the tort's application. For most of its history, the tort was limited to (1) when the discharge stems from asserting a worker's compensation claim (*Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172 (1978)) or (2) where the discharge is for certain activities referred to as "whistle-blowing" (*Palmateer*, 85 Ill. 2d 124 (1981)). Where a matter involves only a private and individual grievance, our courts have consistently refused to expand the tort of retaliatory discharge. See *Geary v. Telular Corp.*, 341 Ill. App. 3d 694, 701 (2003) (collecting cases where Illinois courts have refused to expand the tort of retaliatory discharge).

¶ 31   On review, the question we are asked to answer "is whether the provisions 'enunciate a public policy that plainly covers the situation to which the plaintiff objects.' " *Carty v. The Suter Co.*, 371 Ill. App. 3d 784, 789 (2007) (quoting *Stebbings*, 312 Ill. App. 3d at 367). We conclude the public policy behind the federal Higher Education Act of 1965 and Illinois's Higher Education Loan Act would be seriously undermined if defendant is allowed to act in the manner alleged in plaintiff's complaint. The above-cited statutes demonstrate that in accepting public money, an institution of higher education should be able to assist those attending in

"achieving the required levels of learning and development of their intellectual and mental capacities and skills." 110 ILCS 945/2 (West 2016).

¶ 32    Malcolm X is a public institution of higher learning whose mission and role in society is not to turn a profit but to educate and pass along knowledge to those students enrolled on its campus. In order to receive the benefits from attending classes at Malcolm X, many of its students take out loans under the above state and federal programs in order to subsidize, if not entirely fund, their tuition payments. It is axiomatic that in order to accomplish the mission of educating young men and women, defendant must staff its classes with competent individuals who actually possess the knowledge listed in the course syllabus. If defendant accepts loan money but uses it to hire incompetent and unqualified individuals who cannot properly instruct students who are enrolled in classes like HeaPro 101, defendant has essentially defrauded both the student and the taxpayer. The intent behind both the state and federal loan programs would be thwarted because those receiving incompetent instruction would be unable to "develop their intellectual and mental capacities and skills." *Id.* The benefit to the State would be nil. This is more than a personal matter but concerns "what is right and just and what affects the citizens of the State collectively." *Palmateer*, 85 Ill. 2d at 130.

¶ 33    Defendant argues that Illinois lacks a clearly mandated public policy regarding the right to obtain public financial aid for a postsecondary education. This argument is disingenuous. There would be no point to enacting either a federal or state statute providing for public financing (through student loans) of higher education if the government did not want its citizens to utilize it. Simply put, if our government did not think providing all citizens with access to funds for higher education was a good idea, it would not have enacted the statutes in the first place.

¶ 34    In making its argument, defendant cites solely to *Turner*, 233 Ill. 2d 494, a recent Illinois Supreme Court case. The plaintiff in *Turner* alleged that he was fired from his position as a licensed respiratory therapist after he informed a surveyor from the Joint Commission on Accreditation of Healthcare Organizations (Joint Commission) that his hospital's respiratory department did not conduct "immediate charting" after a patient had been seen in violation of the Joint Commission standard. *Id.* at 497-98. He alleged his discharge for making this report to the Joint Commission " 'violated public policy that encourages employees to report actions that jeopardize patient health and safety.' " *Id.* at 498.

¶ 35    In rejecting the plaintiff's claim, the court concluded plaintiff's actions of informing the surveyor of the hospital's charting practice fell short of the " 'supreme court's public-policy threshold articulated in *Palmateer.*' " *Id.* at 506. The court found that neither Joint Commission standards nor section 3 of the Medical Patient Rights Act (410 ILCS 50/3 (West 2006)) established a clear public policy that plaintiff's discharge violated. *Turner*, 233 Ill. 2d at 505-06.

¶ 36    We find *Turner* to be distinguishable from the current case before us. Unlike the statutes in *Turner*, this case does present a clear statutory scheme which defendant's alleged actions sought to frustrate by terminating plaintiff. Both Illinois and the federal government have set up programs to help citizens attend schools of higher education so that those individuals may gain knowledge and better contribute to society. 20 U.S.C § 1070 *et seq.* (2002); 110 ILCS 945/2 (West 2016). This policy is effectively frustrated when institutions of higher learning terminate those individuals charged with ensuring its instructors have the requisite knowledge

to pass onto students. We find plaintiff's complaint demonstrates a clear mandate of public policy and reverse the dismissal of plaintiff's retaliatory discharge count.

¶ 37    In his second issue, plaintiff argues the circuit court erred in dismissing his Whistleblower Act claim. The Whistleblower Act provides: "An employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of a State or federal law, rule, or regulation ***." 740 ILCS 174/20 (West 2016). In order to sustain a cause of action under the Whistleblower Act, a plaintiff must establish (1) a refusal to participate in an activity that would result in a violation of a state or federal law, rule, or regulation and (2) the employer retaliated against the employee because of said refusal. *Id.*; *Sardiga v. Northern Trust Co.*, 409 Ill. App. 3d 56, 61 (2011). Our courts have recognized the Whistleblower Act extends protection to "employees who call attention in one of two specific ways to illegal activities carried out by their employer. It protects employees who either contact a government agency to report the activity or refuse to participate in that activity." *Sardiga*, 409 Ill. App. 3d at 62.

¶ 38    Before us, plaintiff argues that the second amended complaint sufficiently alleges a "refusal to participate."[3] This court has previously analyzed the language of the Act regarding "refusal to participate" and concluded:

> " 'Refusing to participate' means exactly what it says: a plaintiff who participates in an activity that would result in a violation of a state or federal law, rule, or regulation cannot claim recourse under the Act. 740 ILCS 174/20 (West 2004). Instead, the plaintiff must actually refuse to participate. Black's Law Dictionary defines *'refusal' as '[t]he denial or rejection of something offered or demanded.'* Black's Law Dictionary 1394 (9th ed. 2009). Indeed, the very title of section 20, 'Retaliation for certain refusals prohibited,' suggests that not every refusal qualifies for protection under the Act. 740 ILCS 174/20 (West 2004). Furthermore, the Act protects employees who complain to a government agency about an activity that the employee reasonably believes constitutes a violation of a state or federal law, rule, or regulation. 740 ILCS 174/15 (West 2004). Thus, 'refusing' means refusing; it does not mean 'complaining' or 'questioning ***.' " (Emphasis added.) *Id.*

Even accepting the allegations in the second amended complaint as true and taking them in a light most favorable to plaintiff, there is no allegation in the second amended complaint that defendant offered or demanded plaintiff's participation in the allegedly wrongful activity. Plaintiff pleads that he was "intentionally excluded" and allowed "no input" into the decision to hire or retain the unqualified instructors. While plaintiff alleges he refused "to cover things up," "be quiet," and "look the other way," there is no allegation the defendant asked, requested, or demanded such action.

¶ 39    Plaintiff's brief does not mention *Sardiga* and instead argues that under the Act, "a plaintiff does not need to plead that the defendant specifically asked the plaintiff to perform an unlawful act." In support of this argument, plaintiff only cites to *Robinson v. Morgan Stanley*, No. 06 C 5158, 2011 WL 3876903 (N.D. Ill. Aug. 31, 2011). Federal cases interpreting Illinois law have no precedential value in this state (*Kelsay*, 74 Ill. 2d at 182), and we decline to depart from this court's prior holding in *Sardiga*.

---

[3]There is no allegation in the second amended complaint that plaintiff contacted a governmental agency.

¶ 40 Other Illinois courts have reached similar conclusions regarding what is required to state a claim under the Whistleblower Act. In *Young v. Alden Gardens of Waterford, LLC*, 2015 IL App (1st) 131887, this court determined an employee adequately alleged a violation of the Whistleblower Act, where the employer *asked* its employee to falsify patient records in violation of the Nurse Practice Act (225 ILCS 65/70-5 (West 2010)). *Young*, 2015 IL App (1st) 131887, ¶¶ 51-56 (employee alleged she was constructively discharged for her refusal to follow her supervisor's request to falsify medical records). In *Corah v. The Bruss Co.*, 2017 IL App (1st) 161030, we found plaintiff's whistleblower claim deficient, in part, because "plaintiff acknowledged that defendant *never asked* plaintiff to misstate where [the individual]'s injury occurred" in violation of the Workers' Compensation Act (820 ILCS 305/4(h) (West 2012)). (Emphasis added.) *Corah*, 2017 IL App (1st) 161030, ¶ 19.

¶ 41 We adhere to the line of cases cited above that in order to state a claim under the Whistleblower Act, there must be a request or demand by the employer that the employee engage in the illegal or unlawful conduct. In this case, plaintiff fails to allege the defendant ever made a request or demand he approve or sanction the hiring of the allegedly unqualified instructor. Accordingly, he does not state a claim under the Whistleblower Act.[4]

¶ 42 CONCLUSION

¶ 43 For the reasons stated above, we reverse the dismissal of plaintiff's retaliatory discharge claim but affirm the dismissal of plaintiff's whistleblower claim.

¶ 44 Affirmed in part and reversed in part.

¶ 45 Cause remanded.

---

[4]Because plaintiff failed to establish the first element of a whistleblower claim, we decline to address whether the allege activity of the defendant constitutes "unlawful activity" as required to meet the second element.